NOT DESIGNATED FOR PUBLICATION

No. 118,543

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GIOVANNI M. JUAREZ, A/K/A GIOVANNI JUAREZ-HERNANDEZ,
*Appellant*.


MEMORANDUM OPINION

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed January 11, 2019. Affirmed.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Meghan K. Morgan*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., BUSER, J., and SIDNEY R. THOMAS, District Judge, assigned.


PER CURIAM: The appellant, Giovanni Juarez-Hernandez, who we will call Juarez, hit a jailer so hard he knocked him to the floor, broke the officers' eye socket, and caused him to not only miss work but forced him to undergo surgery for his eye. After agreeing to plead no contest to a lesser charge, Juarez appeals the court's order requiring him to register as a violent offender, claiming he should have received prior notice of the possibility of registration and that the court abused its discretion in ordering him to register. He also claims that any restitution plan is unworkable and the court's order directing him to pay over $23,000 should be set aside. We find no reversible error and affirm.

1

*Juarez violently attacked a jailer.*

While in custody in the Lyon County Jail in May 2015, Juarez punched the right side of a jailer's face near his eye. The punch was so strong it knocked the jailer to the floor. When he got up, the jailer, along with several other officers, subdued Juarez with pepper spray and a Taser and forced him back into his cell.

The jailer's head was bleeding and he had to seek medical treatment at the local emergency room. His right eye was swollen shut, there was bruising around it, and there was a small cut above his right eye. The treating physician reported that the jailer had sustained a severe fracture to the bone around his eye that would require surgery.

This attack led the State to charge Juarez with one count of aggravated battery, intentional great bodily harm or disfigurement, a severity level 4 person felony under K.S.A. 2014 Supp. 21-5413(b)(1)(A).

A few days before his trial, Juarez made a plea agreement with the State. In exchange for his plea, the State amended its complaint by reducing the charge of aggravated battery from a severity level 4 person felony to a severity level 5 person felony. As part of his plea, Juarez agreed to not seek a departure from the presumptive sentence range in the sentencing guidelines. The plea agreement did not address the possibility that Juarez could have to register as a violent offender.

At the plea hearing, the judge explained how Juarez' sentence range would be calculated, based on the severity of the crime and his criminal history score. Then the judge said that his sentence would likely be in the presumptive prison range of 31 to 136 months. The judge warned Juarez that while there was a possibility he could receive a nonprison sanction, "in the case of a violent act, it is extremely difficult for the Court to make those types of findings." The judge also explained to Juarez that a potential

consequence of entering a no contest plea would be an order that he pay restitution to the jailer for his "substantial physical injuries."

Juarez pled no contest to the amended charge of aggravated battery at the reduced severity level. The court found that he voluntarily, knowingly, understandingly, and intelligently waived his constitutional rights and entered his plea of no contest. The court then found there was a factual basis to support a finding of guilt, accepted his plea, and found him guilty of the offense of aggravated battery, a severity level 5 person felony. The court then ordered a presentence investigation. Neither party nor the district court addressed the possibility that Juarez could have to register as a violent offender.

The presentence investigation report set Juarez' criminal history score at G. Based on this score, the presumptive prison sentence range for a severity level 5 aggravated battery was 43-41-38 months with a 24-month term of postrelease supervision. At sentencing, Juarez did not object to his criminal history score and he requested no departure sentence.

At the restitution hearing, the injured jailer characterized Juarez' attack as unprovoked and unexpected. From his many opportunities to observe Juarez, the jailer believed him to be a violent man. The jailer told the court that he had missed work and had two surgeries because of his injuries. His wife and family were also affected by him missing work. After all, they had to attend doctor appointments with him and experience his "mental anguish." While workers compensation covered medical expenses, he had to use vacation time to cover some of his time off from work because the program paid only a percentage of his wages.

Juarez' attorney argued that the district court should consider various mitigating factors and make this sentence concurrent with Juarez' other unrelated sentences. Counsel acknowledged that the crime was committed while he was on supervision, which

3

generally warranted an order to make the new sentence consecutive to any other sentences. The attorney expressed a fear that a longer sentence would have adverse consequences for Juarez' mental stability. The defense counsel suggested that if the court planned to address a possible restitution order, then Juarez' incarceration affected his employability and would make a restitution order unworkable.

Finally, Juarez' attorney addressed the State's notice of a duty to register, stating "but I don't know that this offense requires registration." The judge responded, "It is not a required offense, but the Court may make it a required offense." Juarez' attorney then requested that the district court not exercise its option to require Juarez to register.

The State requested an aggravated sentence because Juarez was on probation—which had been revoked for a prior battery—at the time of this attack on the jailer. For the same reason, the State requested that his sentence be served consecutive to his other sentences. The State requested more than $22,000 in restitution based on a claim from the workers compensation insurance carrier, but it observed that more restitution could be warranted based on the jailer's victim impact statement to the court. The State requested the matter of restitution remain open for additional information. The State suggested Juarez could then present evidence to support his argument that "any plan is unworkable."

After hearing these arguments, the court found Juarez' criminal history score was G and imposed the aggravated term of 43 months in prison consecutive to Juarez' sentences on other unrelated convictions. The court ordered 24 months of postrelease supervision and ordered Juarez to register under the Kansas Offender Registration Act for 15 years for an offense not otherwise required. See K.S.A. 2017 Supp. 22-4902(a)(5).

We note that Juarez signed the notice of his duty to register the day of his sentencing hearing. The judge declined to impose a fine because he did not believe it

4

would have a deterrent effect and he also did not believe Juarez would be able to pay it, "especially with regard to the idea of how much restitution may ultimately be owed in this case." The district court continued the matter of the amount of restitution for a later hearing.

At that restitution hearing, the State requested $2,217.61 for the jailer and $21,531.13 to the workers compensation insurance carrier, for a total of $23,748.74. The jailer testified that he and his wife had to miss work as a result of the injuries he sustained. The workers compensation program required an injured worker to miss 10 consecutive days before being eligible for reimbursement. Since the jailer was only off work for seven days, he did not qualify for reimbursement for those initial days off. After that, the program paid 80 percent of his hourly wage which then was $14.06. He also claimed $200 in travel expenses for about eight trips to Topeka for medical treatment, at around 100 miles roundtrip.

After the court recalculated portions of the State's requested amounts, it found that the total established amount of restitution was $23,538.43, with $21,536.16 to the workers compensation insurance carrier and $2,002.24 to the jailer. The court ordered that any payments should first be distributed to the jailer until satisfied, and then the balance of payments would go to the insurance carrier.

The district court then looked at the feasibility of Juarez to pay restitution. It found that he was a young man with a long career ahead of him, "should he choose to be employed." The court noted his employment history making more than minimum wage and questioned his claims of being disabled. The district court found, "I think it bears an attempt on his part to pay the total amount of the restitution." The district court compared a payment plan for restitution with a payment plan for buying a car, which "most people do." The district court found, "And under those circumstances, I think it's feasible for him to make the effort to [pay restitution]." The court recommended to the Secretary of

5

Corrections that it require payment of the restitution as a condition of postrelease supervision. Finally, the district court specified that the jailer could pursue enforcement of his restitution before Juarez' release.

Juarez contends that the court is simply wrong that his crime—aggravated battery, a level 5 felony—is comparable to those crimes listed in the statute that requires registration and he should not be required to register under the Kansas Offender Registration Act. Also, Juarez complains to us about the lack of notice given to him by the court concerning its intent to order him to register. He contends that he learned of the court's intent to order him to register just minutes before the court imposed the order, thus he was deprived of due process on this point. For his final two points, he argues the restitution order is unworkable and the court erred when it used his criminal history score at sentencing without first submitting the question to his jury. We address the issues in that order.

*The registration act gave the court the authority to order registration here.*

Juarez contends that the district court erred in requiring him to register as a violent offender under the Kansas Offender Registration Act, K.S.A. 2017 Supp. 22-4901 et seq., because (1) his crime of conviction is not listed in the Act as a required offense; (2) it is not a comparable offense to the specified crimes in the Act; and (3) the district court did not make a finding that he committed his crime with a deadly weapon. In response, the State contends that the district court made specific findings about why registration was necessary in this case, and it had the authority to do so under K.S.A. 2017 Supp. 22-4902(a)(5). The State's argument is persuasive.

Whether a person is an "offender" within the meaning of the Act requires interpretation of a statute, a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most

fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016).

We focus on a part of K.S.A. 2017 Supp. 22-4902 which provides a clear statement of judicial discretion to require registration: "As used in the Kansas offender registration act, unless the context otherwise requires: (a) 'Offender' means: . . . (2) a violent offender; . . . [and] (5) *any person required by court order* to register for an offense *not otherwise required* as provided in the Kansas offender registration act." (Emphases added.)

Here, obviously aware of this passage, the court ordered Juarez to register because "this is an offense not otherwise listed under the Kansas Offender Registration Act, but made subject to the Act by order of the Court."

The court further stated that Juarez demonstrated an inability to control his emotions, was capable of physical assault without warning, trigger, or provocation, and he was therefore a significant threat or risk to other persons. The judge then stated:

> "The purpose, at least in part, of the Kansas Offender Registration Act is to permit persons in this community and other communities to gather information about their neighbors, their associates, their associations with other individuals or persons in the community that might pose a risk of harm of some type. A person likely to strike out at others without provocation, trigger, or reason certainly is within the category of persons of which the public should be aware. Therefore, it is my opinion that the defendant should be required to register as a comparable offense under the Kansas Offender Registration Act."

7

The district judge then found that Juarez was an offender required to register, citing K.S.A. 2017 Supp. 22-4902(a)(5) as authority.

Juarez suggests that because the court used the word "comparable" in its reasoning, and because the listed crimes under K.S.A. 2017 Supp. 22-4902(e)(1) are not comparable to aggravated battery—his current crime of conviction—the district court relied on his "personality traits" to impose the registration requirement. See K.S.A. 2017 Supp. 22-4902(e)(3). Likewise, Juarez argues that while a district court has "some discretion" to require registration for comparable crimes, aggravated battery is not a "registerable offense" unless it was committed with a deadly weapon. See K.S.A. 2017 Supp. 22-4902(e)(2).

Juarez conflates subparagraphs (e)(1), (2) and (3) with subparagraph (a)(5) of the statute. We take this argument to claim that (a)(5)—an offender is any person required by court order to register for an offense not otherwise provided for in the Act—can *only* apply if another provision of the Act applies to an offender. Therefore, he argues because the district court did not make findings within the scope of subparagraphs (e)(1), (2) and (3), it was without the authority to order him to register under (a)(5).

We are not so persuaded. First, Juarez provides no authority in support of his interpretation of the statute. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018). Likewise, a point raised incidentally in a brief and not argued therein is also deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). Secondly, this statute appears to be a catch-all provision granting the court the right to order registration in cases that warrant it. In other words, a matter of judicial discretion. Caselaw points in that direction, as well.

8

Recently, the Kansas Supreme Court reasoned that the obligation of a person to register under K.S.A. 2017 Supp. 22-4902(a)(5) arises out of a district court's exercise of discretion to order registration. *State v. Thomas*, 307 Kan. 733, 748, 415 P.3d 430 (2018). One category of registration occurs when it is required by judicial decision. In *State v. Marinelli*, 307 Kan. 768, 784, 415 P.3d 405 (2018), the court held that K.S.A. 2017 Supp. 22-4902(a)(5) and K.S.A. 2017 Supp. 22-4906(a)(1)(M) gives the district court discretion to order registration for an offense not otherwise required as provided in the Act. The court specifically stated that these statutes provide that a criminal defendant can become an "offender" required to register *for any crime* simply if that obligation is imposed by court order.

A judicial order determines, through the exercise of judicial discretion, that the defendant should be considered an offender. *Thomas*, 307 Kan. at 748. The Legislature has invested the district court with the discretionary authority to decide if any person should be ordered to register, as a result of a non-KORA conviction, i.e., to sentence any convicted person to register. 307 Kan. at 755.

Thus, a district court can—within its discretion—order registration for any crime. *Marinelli*, 307 Kan. at 784. We think the Supreme Court means what it says. Juarez then was required to register because the court ordered him to and not because he had committed one of the crimes listed in the Act.

We note that Juarez does not argue that the district court abused its discretion when it ordered him to register as an offender. Issues not adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

The district court gave several convincing reasons for requiring Juarez to register. The court acted within its discretion to order Juarez to register as an offender under the

22-4902(a)(5) "catch all" provision in the Act. We see no reversible error here. We now proceed to the question of notice.

*The court's failure to notify Juarez to register when he was convicted is no reason to void the registration order.*

Juarez claims that since he did not receive notice that his charged offense of aggravated battery could subject him to registration under the Act, his due process rights were violated because the Act requires the district court to inform an offender of the registration requirements on the record at the time of conviction. Thus, he contends he was not given appropriate notice to allow for a meaningful opportunity to be heard on the issue and so the requirement that he register must be vacated. We cannot agree.

It is true that at the time of conviction or adjudication for an offense requiring registration under K.S.A. 2017 Supp. 22-4902, the court shall inform any offender, on the record, of the procedure to register and the requirements of K.S.A. 2017 Supp. 22-4905. See K.S.A. 2017 Supp. 22-4904(a)(1)(A). We note that the Legislature modified K.S.A. 22-4904 in 2012 to specify that a district court inform the offender about registration at the time of conviction, rather than sentencing. See L. 2012, ch. 149, § 3. This change instructed courts to register offenders at conviction or adjudication, rather than at sentencing, and clarified the other responsibilities of the court with respect to offender registration at that time, including additional requirements if the offender is released. Kan. Leg. Research Dept., 2012 Summary of Legislation, HB 2568. This legislative context and history suggests the timing is to help ensure offenders know of their registration obligations. See *Marinelli*, 307 Kan. at 790.

Under the Act, an individual subject to the Act's requirements is obliged to register within three days of release. See K.S.A. 2017 Supp. 22-4904(a)(1)(B)(iii). The statutory directive to inform the offender about registration and complete a duty to register form

before release serves a purpose of preventing lack of knowledge from being raised as a defense to a new charge for failure to register. See *Marinelli*, 307 Kan. at 790.

In our view, the Supreme Court has solved this issue. There is nothing in the Act that creates a consequence for the failure of a court to inform defendants at the appropriate time of their duty to register. A person's status as an "offender" might turn on a court determination, but it is the Act itself that imposes the duty to register upon an offender, not the district court's order. See K.S.A. 2017 Supp. 22-4903(a) (defining a KORA violation as failure by person defined as "offender" to comply with the Act); K.S.A. 2017 Supp. 22-4906 (providing "duration of registration" for "offender" based on convicted crime). In other words, under the plain language of K.S.A. 2017 Supp. 22-4902, neither the fact of notice nor its timing are dispositive of whether a person is an "offender" and, therefore, subject to registration requirements. *Marinelli*, 307 Kan. at 790-91.

While a failure to comply with the notice provision might disadvantage an offender whose only notice would come from the Act itself, here, that is not the case. Juarez claims that he was prejudiced by the late notice, but his description of prejudice is a claim that he did not know why the district court "assumed" he would be a danger in the future. He speculated that yet another psychiatric evaluation with a "proper focus" on recidivism or treatment, coupled with the fact that his crime was not one listed in the Act as requiring registration, would have dissuaded the district court from requiring him to register.

But the record is clear that the district court observed Juarez throughout the proceedings in the case over the course of more than two years and found him to be unpredictable and violent. The district judge even stated that even if Juarez had a diagnosis or explanation for his behavior, he was limited regarding what sort of treatment he could order by the relatively short sentence. In this context where the district judge

11

anticipated the relative lack of weight any new treatment-centered evaluation would have, Juarez fails to explain how this potential new evaluation would have affected the outcome of the district court's order that he register.

The record on appeal is undisputed. The plea agreement did not address the possibility that Juarez could be required to register as a violent offender, and neither the State nor the district court addressed the possibility at the time of his plea and conviction. The record reveals that it was not until the end of the sentencing hearing that Juarez' attorney raised the issue and objected to the imposition of the registration requirement without notice. The judge had just briefly explained the registration requirements and the consequences for failing to adhere to them. Juarez signed the notice of his duty to register on the day of his sentencing hearing. The district court did not completely fail to notify Juarez about registration.

The record also reflects that neither Juarez nor his counsel requested a continuance of the sentencing hearing so he could present evidence regarding why he should not be required to register. Further, because the matter of restitution was scheduled for some weeks after sentencing, Juarez had another opportunity to raise the issue with the district court, but did not.

The district court's failure to notify Juarez of his duty to register at the time of his conviction does not excuse his registration obligations. We now review the restitution questions.

*The restitution order is not an abuse of discretion.*

Juarez contends that restitution totaling over $23,500 is unworkable under the facts of this case. The State argues that the evidence presented at the restitution hearing

12

supported the district court's finding that it was feasible for Juarez to pay restitution in the stated amount. We agree with the State.

If, as here, the issue concerns the "'amount of restitution and the manner in which it is made to the aggrieved party,'" appellate review of an order directing a criminal defendant to pay restitution is reviewed under the abuse of discretion standard. *State v. Shank*, 304 Kan. 89, 93, 369 P.3d 322 (2016). A judicial action constitutes an abuse of discretion if:

- no reasonable person would take the view adopted by the trial court;
- it is based on an error of law; or
- it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

An abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. *Collins*, 303 Kan. at 477. Juarez does not claim that the district court made an error of law or fact, but rather suggests that the district court abused its discretion because the restitution order was unreasonable.

Restitution can be denied if the district court finds that a restitution plan is unworkable. K.S.A. 2017 Supp. 21-6604(b)(1). The burden is on the defendant to present evidence of "compelling circumstances" to prove the restitution plan is unworkable; defendant's imprisonment alone is not sufficient to render restitution unworkable. *State v. Alcala*, 301 Kan. 832, 840, 348 P.3d 570 (2015). At the restitution hearing, the State argued that while Juarez expressed some concerns about his ability to maintain a job, this did not meet the threshold to establish that restitution was unworkable. However, on appeal, Juarez neither claims he met his burden to present compelling circumstances to prove the restitution plan was unworkable, nor does the State argue he failed to meet his

burden. Instead, both parties merely emphasize facts in the record that weigh in support of their respective positions.

A defendant who argues that restitution is unworkable must come forward with evidence of his or her inability to pay. *State v. Meeks*, 307 Kan. 813, 820, 415 P.3d 400 (2018). Unworkability should be evaluated on a case-by-case basis. A district court should use this flexible guideline to determine whether a defendant has met his or her burden to show that a restitution plan would be unworkable. Factors relevant to a district court's inquiry include the defendant's income, present and future earning capacity, living expenses, debts and financial obligations, and dependents. In some circumstances, the amount of time it will take a defendant to pay off a restitution order will also be relevant. In all circumstances, the district court should keep in mind the ultimate goals of restitution: compensation to the victim and deterrence and rehabilitation of the guilty. 307 Kan. at 820.

At the restitution hearing the State requested $2,217.61 for the jailer and $21,531.13 for the workers compensation insurance company, for a total of $23,748.74. Juarez objected to the amount at the hearing because he did not think that "it's worth paying that much," and he believed it was "way too much," because he claimed he injured the jailer accidentally.

Juarez calculated that he would need to serve more than 14 months on his sentence before he could be released. He testified inconsistently throughout the hearing. He claimed he wanted to look for a job upon release, but expressed doubt about his capabilities because he "had a K2 incident" from smoking synthetic marijuana. He claimed he felt "kind of disabled," and stated, "I'm probably not going to be able to get a job." Juarez then indicated he would pursue disability benefits. Juarez also stated that he did not feel the effect of the synthetic marijuana anymore, and he believed he could function in a job. However, he was not sure how long he would be able to hold a job

14

because of the "K2 incident," which "kind of damaged [his] brain a little bit." Nevertheless, Juarez believed his brain had "improved a lot." He acknowledged he was not on disability prior to his arrest.

Juarez previously worked at a food company; he was employed there for almost one year, earned $9.25 per hour, and worked 25 hours per week. He then worked cleanup at a meat processing facility earning approximately $8 to $9 per hour, full-time for approximately five months. Juarez claimed he was unemployed for approximately one to two years before his incarceration. His last paycheck was in 2013.

Juarez believed he got along well with others and that he could keep pace with a job. However, Juarez also claimed he was not able to move as quickly as he used to because of his brain damage. Juarez wanted to return to the food company, but admitted he was fired from that job for missing too many days. He believed they would hire him back. Juarez did not claim to have physical limitations on his ability to work. He believed he had a "good chance" at finding a job when released from prison, but doubted he was fully capable of working. He wanted to try to qualify for disability first.

Juarez believed he had one year left of high school. Juarez stated he had a learning disability, so he took remedial classes in high school because "normal classes" were "too hard." He had received no educational or occupational training in the time he had been in prison.

The district court acknowledged these circumstances, as well as Juarez' youth and potentially long career. It observed that many people meet financial obligations on payment plans and analogized the restitution amount with buying a car on installment payments. In ordering restitution, the district court determined that any payments should first go to the officer and then once that portion of the order was satisfied, payments should go to the workers compensation company. The district court stated that it "bears

15

an attempt" and was feasible for Juarez to "make the effort" to pay restitution, suggesting not only restitution as compensation to the victim, but to foster Juarez' rehabilitation. The district court acknowledged that it could not order the Department of Corrections to "do anything during the period of [Juarez'] incarceration or to establish his post-release condition terms," but it could "only recommend those [terms]." In so doing, the district court appeared to acknowledge the prisoner review board would make another assessment regarding whether the restitution order was unworkable prior to establishing terms for Juarez' postrelease supervision. See K.S.A. 2017 Supp. 22-3717(n).

Juarez relies on *State v. Herron*, 50 Kan. App. 2d 1058, 335 P.3d 1211 (2014), to support his argument that the district court's restitution order was unreasonable and therefore an abuse of discretion. Herron was indigent with a monthly income of $680 and only $32 left per week after paying her expenses, including a modest sum for child support, yet the district court ordered her to pay restitution in the amount of nearly $6,900. In *Herron*, a panel of this court found that the district court abused its discretion because "no reasonable person would agree that requiring Herron to pay either $6,864.10 in 18 months [her term of probation] or $10 a month for the next 57 years is workable." 50 Kan. App. 2d at 1065-66.

Juarez' reliance on this case is misplaced. Many facts are distinguishable, from Herron's child support payment to the character of the sentence. Herron was sentenced to 18 months' probation, and it was not feasible for her to pay the restitution order within that time frame. In this case, Juarez did not present any evidence of dependents or other financial obligations, and he was sentenced to prison for 43 months to be served consecutive to other sentences. The record does not state when he will be eligible for release. Even then, he will have an additional term of 24 months as postrelease supervision.

16

Based on the evidence presented at the restitution hearing, Juarez did not establish an inability to pay the restitution order. He did not meet his burden to present evidence of "compelling circumstances" to prove the restitution plan is unworkable. Juarez expressed a desire to find work and an awareness that a long-term payment plan might be warranted. The district court acknowledged the rehabilitative purpose of restitution and the prisoner review board's potential reassessment of the restitution order prior to Juarez' release. Juarez has failed to establish that no reasonable person would take the view adopted by the trial court. We see no reason to modify the district court's restitution order.

*Precedent compels us to deny Juarez' final argument.*

Juarez argues that the district court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because the State did not include his prior convictions in the complaint and was therefore not required to prove those convictions to a jury beyond a reasonable doubt. He argues his criminal history score was used to unconstitutionally increase his sentence.

Juarez acknowledges that the Kansas Supreme Court considered and rejected similar arguments in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), and *State v. Hitt*, 273 Kan. 224, 42 P.3d 732 (2002), but he raises the issues to preserve it for federal review. Since there is no indication that our Supreme Court is departing from its holdings in *Ivory* or *Hitt*, this court is duty bound to affirm. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015).

Affirmed.