IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,976

STATE OF KANSAS,
*Appellee*,

v.

MARQUIS J. MARSHALL,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court applies an abuse of discretion standard when determining whether a district court made the correct decision regarding a defendant's competency to stand trial.

2.

Judicial discretion can be abused in three ways:  (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact.

3.

Under K.S.A. 22-3301(1), a defendant is incompetent to stand trial when he or she cannot understand the nature or purpose of the proceedings or cannot make or assist in making his or her defense because of mental illness or defect.

4.

The failure to hold a competency hearing when evidence raises a bona fide doubt as to defendant's competency is a denial of due process. Courts presume a criminal

defendant is competent to stand trial. Furthermore, a defendant is not incompetent to stand trial simply because he or she has received or needs psychiatric treatment.

5.

To protect a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a district court must inquire into potential conflicts between a defendant charged with a felony and defense counsel if (1) the court is aware of the conflict or (2) it is brought to the court's attention. A district court abuses its discretion if it becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry. Furthermore, a district court can abuse its discretion if it conducts an inquiry into a defendant's claim of dissatisfaction with his or her attorney but the inquiry fails to fully investigate (1) the basis for the claim and (2) the facts necessary for determining if that dissatisfaction justifies appointing new counsel.

6.

Though an indigent criminal defendant has a constitutional right to the assistance of counsel, such a defendant cannot compel the district court to appoint the counsel of defendant's choice. To warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with his or her appointed counsel. Justifiable dissatisfaction may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.

7.

As long as the trial court has a reasonable basis for believing the attorney-client relationship has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel.

8.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. Cumulative error, however, will not be found when the record fails to support any of the errors raised on appeal by the defendant.

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed December 18, 2015. Affirmed.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Derek Schmidt*, attorney general, and *Marc Bennett*, district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Marquis Marshall was convicted of capital murder in connection with the November 2012 slayings of Zachary Hunt and Henry Harvey inside a Wichita Dollar General store. The district court imposed a sentence of lifetime imprisonment without the possibility of parole.

On appeal, Marshall does not challenge the sufficiency of the evidence presented against him at trial. But he raises four arguments for why his capital murder conviction cannot stand: (1) The district court erred when it failed to order a competency evaluation; (2) the district court erred when it failed to sufficiently inquire into Marshall's requests for new counsel; (3) the district court judge erred when he allegedly misspoke during his reading of the instructions to the jury; and (4) the cumulative effect of these

3

errors deprived Marshall of a fair trial. Finding no merit with any of these arguments, we affirm Marshall's conviction.

FACTS

The evidence presented at Marshall's trial established that shortly after 8 p.m. on November 30, 2012, he entered a Wichita Dollar General store and proceeded to walk down an aisle. At the time, Hunt, an employee of the store, was at the cash register tallying up customer Harvey's purchases. A few seconds later, Marshall emerged from the aisle holding a .22 caliber pistol. He walked to the front of the store and fired three shots into Hunt's body and then three shots into Harvey's back, killing both men. In a rush to flee, Marshall attempted to exit the store by first pushing against the store's inwardly-swinging entrance door with his bare palm. He quickly realized his error and escaped through the store's designated exit. The entire incident—from Marshall's entry to his eventual flight from the store—lasted less than 1 minute.

A store employee who was in the storage room during the shooting eventually called 911. Law enforcement quickly arrived at the scene and reviewed the video captured on the store's surveillance system. Though the resolution of the video was too poor to yield any specific details (aside from gender) regarding the shooter, it showed the particular location on the entry door where the shooter had placed his palm as he attempted his exit through the door. A crime scene investigator inspected that area of the door and found a palm print. The print was lifted from the door and transferred to the crime lab for immediate testing. A latent print examiner determined that the print matched a known print of Marshall's contained within a database.

Notably, footage from inside the store showed a store employee wiping down the inside of the entry door a few hours before the shooting, thus eliminating or greatly

reducing the possibility that Marshall's print was left on the door during an earlier visit to the store.

On December 2, 2012, Marshall was arrested during a traffic stop. He was taken to the police station where he was questioned by detectives. After answering a few biographical questions, Marshall was advised of and waived his *Miranda* rights, agreeing to speak with the detectives. During the interview, the detectives showed Marshall a picture of the shooter placing his hand on the entry door and told Marshall that his fingerprints had been found on that area of the door. In response, Marshall said, "'Obviously.'" Though Marshall denied being at the store during the time of the shootings, he told the detectives, "'I never expect myself to kill anybody.'" When the discussion turned to what gun the shooter used, Marshall asked whether the gun was a .22 before officers could mention that fact. Throughout the interview, Marshall had no trouble understanding and answering the detectives' questions. Marshall eventually asked for a lawyer, causing the detectives to end the interview and leave the interrogation room.

While Marshall was alone in the room, a police officer monitored video and audio footage of the room. During this time, the officer heard Marshall make several statements to himself. According to the officer, who took notes at the time, Marshall made the following statements:

- "'Crazy. They think I killed two people. Two whole people. I never killed nobody. Rest of my life in prison and I didn't even get to kill anybody.'"

- "'My grandmother thinks I killed two people, my mom thinks I killed two people. I think I'm starting to think I killed two people. I don't give a fuck. I don't even like Dollar General.'"

- "'I'm thinking about a full-out confession, but I don't know where to start. I really don't.'"

- "'Funny, all the bad things I have done in my life, only one thing I wish I could take back, and I'm telling you, it was that night. Only thing I ever wish I could take back. Like anybody and everybody else, if I could take back that one night, I swear, heartbeat, just so you could be here.'"

- "'You think it's over for me or what? I think it's been over for me, honestly, too. You knew me. Did you think I would do something like this? But you know the truth. You know what kind of person I am. You also know that I don't like shooting .22s, don't you. I hate .22s with a passion.'"

- "'Swear I don't know how my fingerprints got on that door. I don't even remember going to Dollar General that day.'"

- "'I remember all I had to do was pull the trigger and you would be here today.'"

On December 5, 2012, Marshall was charged with one count of capital murder. On April 2, 2013, he filed a pro se motion under K.S.A. 2014 Supp. 60-1501, seeking termination of defense counsel. Marshall alleged that the request was based on counsel's lack of performance and "a conflict of breakdown communication." Marshall also alleged that counsel had engaged in unethical behavior based on his refusal to communicate with Marshall regarding continuances or to provide him information on a death penalty defense. Marshall also alleged that he had only spoken to defense counsel one time since his confinement in the Sedgwick County Jail.

Prior to Marshall's preliminary hearing on May 2, 2013, the district court addressed Marshall's motion, advising him that his "motion or petition for ineffective assistance" was likely premature given the early stage of his case. The district court then asked Marshall whether he desired to proceed with the motion to have counsel dismissed. Marshall declined, saying he wanted to withdraw the motion and proceed with defense counsel.

In July 2013, Marshall filed two pro se motions. The first motion requested that he be sent to Larned State Hospital for an evaluation. In support of this motion, Marshall noted that he had been previously sent to Larned, had taken "meds for mental problems" in the past, and was seen by a doctor while at Larned. The second motion requested that his counsel be dismissed for ineffective assistance based on "(1) lack of communication[,] (2) irreconcilable differences[,] and (3) conflict of interest." Marshall did not provide any factual allegations to support his assertions.

On August 27, 2013, a hearing was held to address the two motions. When asked what the basis was for his motion to dismiss defense counsel, Marshall was vague, saying that he did not think defense counsel had done anything for him and that defense counsel was "not communicating with my family, not telling me things I need to know, that he needs to tell me." The district court asked Marshall to provide a legal basis for removing defense counsel. Marshall responded that he did not know "exactly what to say." The district court denied the motion after Marshall conceded that there was no basis for his motion. With regard to Marshall's request to be sent to Larned for an evaluation, Marshall told the court that he did not write the motion himself and that he did not "even know what Larned is exactly." In response, the district court denied that motion as well.

In September 2013, Marshall began refusing to visit with defense counsel. (According to comments made by the prosecutor at a September 25 hearing, prior to

7

Marshall's refusal to see his attorney, defense counsel had visited Marshall 20 to 25 times.) Marshall also refused clothes that defense counsel had brought to him to wear during his trial. The district court conducted a hearing on the matter on September 25. When Marshall was asked why he was refusing to meet with his attorney, he said, "Me and my lawyer ain't seeing eye to eye." When asked to elaborate, Marshall said he did not think defense counsel was "working for me to the best of his abilities." The district court asked Marshall what he expected defense counsel to do prior to the start of trial on September 30. Marshall replied, "I didn't say I expect him to do anything." After the district court judge advised Marshall that trial would not be delayed due to his refusal to meet with defense counsel and that he would be forced to wear his jail-issued jumpsuit if he refused the clothes that defense counsel had offered to him, Marshall told the court that he would meet with his attorney and that he would wear the clothes.

Later at the hearing, the district court asked defense counsel whether there was anything he wanted to put on the record. Defense counsel stated:

"[Marshall] has assured me that when I come to see him he's going to see me, and we've seen each other a lot. And I—I'm—I don't take this lightly. And I think a failure—a breakdown in communication is the standard whether I should move to withdraw.

"And I think we've communicated sufficiently in the past. He certainly knows what I think. I haven't—I haven't shied away from my opinion, or what he's going to see at the trial, or what his options are. I think he understands those. If I didn't think that I would have filed competency papers. I've not done that; I don't think he's incompetent.

"I've told him that I'll be up to see him, you know, a couple of times between now and Monday [the first day of trial] this weekend. I'll be here all weekend. And he's agreed to come out and see me, so I think we'll be ready on Monday."

Marshall's trial proceeded as scheduled on September 30. At the conclusion of the trial, the jury found Marshall guilty of capital murder. Because the State did not seek the

death penalty, the district court imposed the mandated sentence of lifetime imprisonment without the possibility of parole.

Marshall filed a timely notice of appeal.

COMPETENCY EVALUATION

Marshall first argues that the district court should have construed his pro se motion requesting a psychological evaluation at Larned as a motion to determine his competency to stand trial. Marshall contends that the circumstances surrounding his case (the irrationality of his crime, his rambling monologue while left alone in the interrogation room at the police station, his claim that he had previously been sent to Larned State Hospital and that he has taken medication for his "mental problems") should have put the district court on notice that his competency to stand trial was at issue and needed to be verified.

Under K.S.A. 2014 Supp. 22-3302(1), a district court judge has a duty to inquire into a defendant's competency should the circumstances warrant. The statute states:

> "If . . . upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant." K.S.A. 2014 Supp. 22-3302(1).

An appellate court applies an abuse of discretion standard when determining whether a district court made the correct decision regarding a defendant's competency to stand trial. *State v. Foster*, 290 Kan. 696, 703, 233 P.3d 265 (2010) (applying abuse of discretion standard to determine whether district court, after ordering defendant to Larned State Hospital for a competency evaluation, conducting a competency hearing, and

9

finding defendant competent to stand trial, erred when it failed to revisit defendant's competency to stand trial *sua sponte* under K.S.A. 22-3302[1] based on defendant's subsequent behavior at trial). "Judicial discretion can be abused in three ways: (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact." *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

A defendant is incompetent to stand trial when he or she cannot understand the nature or purpose of the proceedings or cannot make or assist in making his or her defense because of mental illness or defect. K.S.A. 22-3301(1). This standard is in accord with the standard pronounced by the United States Supreme Court, which states that "the 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). "The failure to hold a competency hearing, when 'evidence raises a bona fide doubt as to defendant's competency, is a denial of due process.' [Citations omitted.]" *State v. Foster*, 290 Kan. 696, 704, 233 P.3d 265 (2010). "Courts presume a criminal defendant is competent to stand trial." *State v. Barnes*, 293 Kan. 240, 256, 262 P.3d 297 (2011). Furthermore, "[a] defendant is not incompetent to stand trial simply because that individual has received or needs psychiatric treatment." *State v. Harkness*, 252 Kan. 510, 516, 847 P.2d 1191 (1993).

With regard to Marshall's assertion that his competency to stand trial was put into question based on the irrationality of his crime, the State aptly responds by stating that "[t]here is seldom a rational or logical explanation for violent crimes, but the inexplicable nature of a defendant's choice of actions is not, in and of itself, a sign of incompetency." In *State v. Shopteese*, 283 Kan. 331, 153 P.3d 1208 (2007), the court stated:

10

"'"[I]f the accused is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition with reference to such proceedings, and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subject his mind may be deranged or unsound." [Citations omitted.]'" 283 Kan. at 341 (quoting *Van Dusen v. State*, 197 Kan. 718, 722-23, 421 P.2d 197 [1966]).

See also *State v. Barnes*, 293 Kan. 240, 256, 262 P.3d 297 (2011) (same).

The only facts that Marshall alleged within his motion to support his request for a competency evaluation was that he had been sent to Larned before, had taken medications for mental problems, and was seen by a doctor while at Larned. At the hearing to address this motion and Marshall's second motion to dismiss counsel, Marshall was clearly able to communicate with the district court judge and responded appropriately to the judge's questions. When the judge asked Marshall about his motion requesting the evaluation, Marshall conceded that he did not write the motion (presumably someone in jail had drafted the document for him) and stated, "I don't even know what Larned is exactly." Though the facts alleged in the motion warranted further exploration at a hearing, Marshall's behavior and verbal responses to the judge's inquiry at that hearing did not put into question his competency to stand trial.

Similarly, Marshall's behavior at his interview with detectives (evidence of which, based on the record, was not presented to the district court until during Marshall's trial) did not warrant an evaluation of Marshall's competency. According to one of the detectives that interviewed Marshall, Marshall asked about his *Miranda* rights at the start of the interview and appeared to understand the nature of those rights when they were read to him. Marshall also had no trouble communicating with the detectives throughout the interview, showing a keen awareness for why he was being questioned and

11

responding appropriately to the detectives' questions. Perhaps most significantly, Marshall ended the interview by invoking his right to counsel, displaying a clear understanding of his rights and how to exercise them.

Though the subsequent comments Marshall made while left alone in the interview room appear unusual when viewed in isolation, his behavior before and after the comments—especially his behavior at several pretrial hearings where he was able to clearly communicate with the court—shows that Marshall possessed mental faculties capable of understanding the legal proceedings against him and assisting with his defense. This conclusion is supported by defense counsel's comments at the last pretrial hearing indicating that he had visited with Marshall on numerous occasions and had been able to discuss the legal aspects of the case with him. Significantly, defense counsel told the district court that he had not filed a motion to determine Marshall's competency to stand trial because he did not think Marshall was incompetent.

Despite Marshall's argument to the contrary, a review of the record on appeal does not raise a bona fide doubt regarding his competency to stand trial. Accordingly, we conclude that the district court did not abuse its discretion by failing to order *sua sponte* an evaluation of Marshall to determine his competency.

INQUIRY INTO MARSHALL'S REQUEST FOR NEW COUNSEL

On two separate occasions, Marshall filed motions requesting the appointment of new counsel. Marshall withdrew the first motion, and the district court denied the second motion. Marshall argues that the district court did not conduct a sufficient inquiry regarding the basis for these motions.

12

To protect a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a district court must inquire into potential conflicts between a defendant charged with a felony and defense counsel if (a) the court is aware of the conflict or (b) it is brought to the court's attention. *State v. Vann*, 280 Kan. 782, 789, 127 P.3d 307 (2006). "A district court abuses its discretion if it becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry." *State v. Pfannenstiel* 302 Kan. 747, Syl. ¶ 5, 357 P.3d 877 (2015). Furthermore, a district court can abuse its discretion if it conducts an inquiry into a defendant's claim of dissatisfaction with his or her attorney but the inquiry fails to fully investigate (1) the basis for the claim and (2) the facts necessary for determining if that dissatisfaction justifies appointing new counsel. 302 Kan. 747, Syl. ¶ 6.

Though an indigent criminal defendant has a constitutional right to the assistance of counsel, such a defendant cannot compel the district court to appoint the counsel of defendant's choice. To warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with his or her appointed counsel. *State v. Bryant*, 285 Kan. 970, 986-87, 179 P.3d 1122 (2008); *State v. Hegwood*, 256 Kan. 901, 903, 888 P.2d 856 (1995). Justifiable dissatisfaction may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. *Bryant*, 285 Kan. at 986. "'"[A]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."'" *Bryant*, 285 Kan. at 986-87 (quoting *State v. Ferguson*, 254 Kan. 62, 70, 864 P.2d 693 [1993] [quoting *State v. Banks*, 216 Kan. 390, 394, 532 P.2d 1058 (1975)]).

With regard to the first motion (alleging a lack of performance, "a conflict of breakdown communication," unethical behavior based on defense counsel's refusal to

discuss continuances or provide information on a death penalty defense, and just one discussion with defense counsel since being incarcerated), the district court addressed the motion prior to Marshall's preliminary hearing. After advising Marshall that defense counsel was one of a few attorneys in the state qualified to handle a capital murder case and that the motion to terminate defense counsel was likely premature due to the infancy of the case, the district court judge asked Marshall whether he wanted to proceed with his motion. Marshall responded by saying he wanted his motion withdrawn and agreed that defense counsel should continue representing him. These facts demonstrate that the district court inquired into the basis for Marshall's motion. Because Marshall withdrew his motion, it was proper for the district court to maintain defense counsel's appointment as Marshall's attorney without inquiring into the matter further.

Marshall's second motion alleged that defense counsel was providing him ineffective assistance based on "(1) lack of communication[,] (2) irreconcilable differences[,] and (3) conflict of interest." As mentioned above, Marshall did not provide any factual allegations within his motion to support these assertions. Likewise, he did not make any factual allegations at the hearing on the motion to show that he had a justifiable dissatisfaction with defense counsel. When the district court asked Marshall to explain his displeasure with defense counsel, Marshall stated that he did not think defense counsel had done anything for him and that defense counsel was "not communicating with my family, not telling me things I need to know, that he needs to tell me." When asked to elaborate, Marshall responded by saying he did not know "exactly what to say." The district court denied the motion after Marshall conceded that there was no basis for it. Based on these facts, it cannot be said that the district court failed to conduct a sufficient inquiry as to why Marshall wanted new counsel or that the district court acted unreasonably by denying Marshall's motion. Marshall failed to articulate any specific facts to support the conclusory allegations contained within his motion.

14

Instead of having a justifiable dissatisfaction with defense counsel, it appears that Marshall was filing his motions for new counsel for the purpose of delaying the case. As indicated above, Marshall's trial was scheduled for September 30, 2013. When this date drew near, Marshall began refusing to visit with defense counsel despite having seen him on numerous occasions. Marshall also refused to accept clothes that defense counsel had brought to him to wear during his trial. At the hearing to look into the matter, the district court asked Marshall why he was refusing to meet with his attorney. Similar to his prior statements, Marshall's comments about defense counsel remained conclusory and vague. Marshall said, "Me and my lawyer ain't seeing eye to eye." When asked to elaborate, Marshall said he did not think defense counsel was "working for me to the best of his abilities." The district court asked Marshall what he expected defense counsel to do prior to the start of trial on September 30. Marshall replied, "I didn't say I expect him to do anything." After the district court judge advised Marshall that trial would not be delayed due to his refusal to meet with defense counsel and that he would be forced to wear his jail-issued jumpsuit if he refused the clothes that defense counsel had offered to him, Marshall told the court that he would meet with his attorney and that he would wear the clothes.

Finally, defense counsel's comments at the hearing indicate that the district court acted appropriately in refusing to appoint new counsel. Defense counsel stated that he and Marshall had spoken on numerous occasions about the case and that Marshall had agreed to see him that weekend in order to prepare for trial on Monday. Defense counsel also expressed the opinion that they had "communicated sufficiently in the past" and had not reached "a breakdown in communication." Thus, it appears that defense counsel and Marshall were able to maintain a relationship that allowed defense counsel to "give effective aid in the fair presentation of a defense." See *Bryant*, 285 Kan. at 986-87.

15

Based on the record before this court, we conclude that the district court did not abuse its discretion by failing to inquire further into the reasons for Marshall's displeasure with defense counsel.

## THE READING OF THE JURY INSTRUCTIONS

Next, Marshall argues that the district court judge committed reversible error during his reading of the instructions to the jury by mistakenly telling the jury that Marshall pled "guilty" to the charge of capital murder. In support of his claim, Marshall points to the trial transcript originally filed with this court, indicating that during the reading of Instruction No. 5—informing the jury that Marshall was charged with capital murder and describing the elements of that crime—the judge stated that Marshall pled "guilty" to capital murder.

In response to Marshall's claim, the State looked into the matter and determined that the judge had correctly told the jury that Marshall pled "not guilty" to capital murder but that the court reporter had inadvertently omitted the word "not" from the transcript. Subsequently, the court reporter who prepared the original transcript filed an amended transcript reflecting this change—now Vol. XIV of the record on appeal—and an amended certificate of filing, which noted the error in the original transcript. Marshall has not filed any response to these developments. Accordingly, we conclude that Marshall's claim of judicial error during the reading of the jury instructions is without merit.

## CUMULATIVE ERROR

Marshall argues that his conviction should be reversed based on the cumulative effect of the errors he has raised on appeal.

16

Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Smith*, 296 Kan. 111, 134, 293 P.3d 669 (2012). Cumulative error, however, "will not be found when the record fails to support the errors raised on appeal by the defendant." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

We have concluded that none of the issues raised on appeal constitute error. Accordingly, we reject Marshall's cumulative error argument.

Marshall's conviction for capital murder is affirmed.