NOT DESIGNATED FOR PUBLICATION

No. 118,740

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JESUS ALEXANDER HOLGUIN-LOREDO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed April 5, 2019. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: Police arrested Jesus Alexander Holguin-Loredo (Loredo) for aggravated burglary and criminal restraint for breaking into the home of James and Kelci Ebrecht. After complaining of stomach pain while at the Ebrechts' residence, the police transported Loredo to the hospital. While at the hospital, Loredo asked to speak with the police. He told officers that he broke into the home to steal cocaine for his stepfather who had threatened to hurt Loredo's younger brother.

A jury convicted Loredo of all charges. After trial, the district court allowed his trial attorney to withdraw from representing him and the court appointed a new attorney

1

for him. The new attorney moved for a new trial based on suppression and instructional errors and ineffective assistance of trial counsel. Loredo asserted that his trial counsel was ineffective because she failed to pursue a defense of voluntary intoxication, failed to communicate with Loredo, and failed to ensure that Loredo had an interpreter present at hearings. The district court denied Loredo's motion and Loredo appeals.

On appeal, Loredo argues that the district court erred by: (1) denying his motion to suppress; (2) refusing to instruct the jury on the voluntary intoxication defense; (3) not instructing the jury on the defense of compulsion; and (4) denying his motion for a new trial based on ineffectiveness of counsel. After thoroughly reviewing all of Loredo's claims, we find no error and affirm his convictions.

FACTUAL AND PROCEDURAL HISTORY

In early May 2015, Kelci and James Ebrecht were in their home in Johnson County with their four boys. At around 11 p.m., they noticed the backyard motion light switched on for no apparent reason. Later, they went to their bedroom on the second floor of the house and fell asleep. At some point in the night, James heard faint sounds coming from downstairs. He went downstairs but did not notice anything unusual in the house. Instead of going back upstairs, James decided to lay down on the couch where he eventually fell back asleep.

Kelci later woke up because someone was holding her arms down. She opened her eyes and realized that it was someone she did not know. Kelci began screaming and flailing and the man, later identified as Loredo, "shushed" Kelci. Kelci continued to scream and Loredo fled the bedroom. James woke up to Kelci's screams. He ran up the stairs and met Loredo on the landing. James and Loredo began to fight on the stairs and fell down onto the first floor. While James subdued Loredo, Kelci called 911. The police arrived a short time later.

2

Officer Travis Clarke was the first officer to arrive. Clarke saw James holding Loredo down. He started to issue Loredo commands, which Loredo followed. Clarke noticed Loredo's dilated eyes and the odor of alcohol coming from him. After detaining Loredo, the officer searched the rest of the house to ensure no other intruders were present. No one who did not belong in the house was located. Clarke also walked around the outside of the home and discovered that Loredo entered the house through an open window. He also noticed the gate to the backyard was open and there was a shoe print in the mud, which matched Loredo's shoes.

While still at the Ebrechts' home, Loredo complained that his neck and stomach hurt. Officer Clarke thought Loredo looked like he might get sick. Clarke brought Loredo outside so that he could get some air and asked if he needed medical attention. Loredo said he needed medical attention. While waiting for medical personnel to arrive, Loredo sat on the ground and had to lean against two officers so that he would not fall over. Medical personnel arrived and spoke with Loredo. Clarke noticed no communication problems between Loredo and medical personnel.

Medical personnel spent about 10 minutes evaluating Loredo before medically clearing him. Loredo continued to request medical attention. Officer Daniel Urbik transported Loredo to a local hospital.

Within two hours of being arrested and transported to the hospital, Loredo asked to speak with Officer Urbik. Urbik testified that he read Loredo his rights consistent with *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), before speaking with him. Urbik recorded the conversation. Loredo seemed to understand what was happening in the conversation. He answered questions appropriately, provided phone numbers, and spelled names.

Loredo told Urbik that he went into the house because his stepfather, Rigoberto Chabira, threatened to hurt Loredo's brother unless he stole cocaine from the Ebrechts' basement. According to Loredo, there was four ounces of cocaine in the Ebrechts' basement. Loredo explained that he entered the house through an unlocked front window. Loredo agreed that going into someone's home uninvited was wrong. According to Loredo, he had ten beers and some cocaine before breaking into the Ebrechts' home.

Officer Clarke followed up with the Ebrechts about Loredo's assertion that there was cocaine in the home. James told Clarke that Chabira was his neighbor who had borrowed money from James and parked vehicles in the Ebrechts' driveway. Clarke asked James about the cocaine and James responded that there no drugs in the house. Clarke did not ask to search for cocaine in the house because he had noticed no drugs or drug paraphernalia when he searched the house for possible additional intruders the night of the break-in. Clarke acknowledged that his search was for people and not drugs.

Chabira claimed that he and Loredo drank a nine-pack of beer on the evening in question. According to Chabira, he had five or six beers while Loredo drank the others. Chabira said that he and Loredo were drinking until around two in the morning.

The State charged Loredo with one count of aggravated burglary and one count of criminal restraint. Loredo moved to suppress his statements to police, arguing that he was not capable of knowingly waiving his rights under *Miranda* and that the police impermissibly continued to ask Loredo questions after he invoked his right to silence. The district court denied Loredo's motion, holding that Loredo reinitiated contact with the police at the hospital and that Loredo knowingly waived his rights under *Miranda* and made a voluntary statement to police.

Loredo chose not to testify at his jury trial. Loredo's trial counsel noted on the record that she had informed Loredo that if he chose not to testify it would hamper his

4

ability to present a voluntary intoxication defense. Loredo told the judge that he understood and that he still did not want to testify. Loredo's trial counsel requested a voluntary intoxication jury instruction. The court denied Loredo's request. The jury found Loredo guilty on both counts.

After trial, but before sentencing, Loredo's trial counsel moved to withdraw from the case. At a hearing on the motion, Loredo's trial counsel informed the court that she filed no posttrial motions because Loredo told her not to do so.

The district court appointed Loredo new counsel who requested permission to file an untimely motion for new trial based on the ineffectiveness of Loredo's original trial counsel. The court granted Loredo an evidentiary hearing to determine whether his trial counsel was ineffective for:  (1) failing to discuss discovery or make appropriate jail visitations; (2) failing to discuss the possible penalties Loredo faced if convicted; (3) not having an interpreter present at court proceedings; (4) not properly explaining Loredo's right to testify; (5) not informing him of his right to call witnesses; and (6) not following up on medical records or experts relating to his voluntary intoxication defense.

Loredo's trial counsel testified at the evidentiary hearing. She testified that she met with Loredo in June 2015 for just under an hour where she discussed the charges against him, the penalties associated with the charges, and potential immigration consequences. During the initial meeting she also discussed the facts of the case and what he recalled of the incident. They also discussed the possibility of getting a plea deal for misdemeanors which might not affect his immigration status as severely as a felony conviction.

Loredo's trial counsel also explained that she spent time to make sure Loredo understood what she was talking about. According to trial counsel, Loredo "seemed very comfortable and very competent" in his understanding of English and the concepts they were discussing. Loredo and his trial counsel also discussed whether he would like to

5

have an interpreter at future proceedings. According to his trial counsel, Loredo told her that he had been in the United States since he was three, graduated high school, and worked jobs in the United States. His trial counsel considered "English . . . his primary language."

Dr. Robert Barnett also testified on behalf of Loredo. Dr. Barnett testified that Loredo's intoxication might have played a role in his actions because the "behavior appear[ed] to be out of character for him." He also testified that the use of drugs and alcohol could affect a person's ability to commit an aggravated burglary. During cross-examination, Dr. Barnett acknowledged that he had reviewed no police reports while forming his opinion. Dr. Barnett had also not reviewed Loredo's statement to police. But Dr. Barnett testified that the additional information would not have "changed [his] conclusions very much."

The district court denied Loredo's motion for a new trial and the case went on to sentencing. The court sentenced Loredo to 34 months' imprisonment. Loredo filed a timely notice of appeal.

ANALYSIS

Loredo argues that the district court erred by: (1) denying his motion to suppress his statement to police; (2) not instructing the jury on the voluntary intoxication defense; (3) not instructing the jury on the compulsion defense; and (4) denying his motion for new trial based on the alleged ineffectiveness of his trial counsel.

*The district court did not err in denying Loredo's motion to suppress.*

Before trial Loredo moved to suppress his recorded statement to police. The district court denied the motion finding that Loredo: (1) initiated the conversation with

6

police; (2) was given *Miranda* warnings; (3) was coherent when he gave the statement; and (4) voluntarily made his statement to the police.

Our standard of review for a district court's decision on a motion to suppress has two components. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. We review the ultimate legal conclusion, however, using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Gilliland*, 294 Kan. 519, 527, 276 P.3d 165 (2017).

The State is prohibited from admitting the defendant's statement at trial if his or her statement was involuntary. *Colorado v. Connelly*, 479 U.S. 157, 163-64, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). To determine whether a defendant's statement is voluntary, the court considers the totality of the circumstances. *Gilliland*, 294 Kan. at 528. When making the determination, the court considers these nonexclusive factors:

> "(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." 294 Kan. at 528.

When addressing whether the defendant's intoxication affected his or her mental state the court considers: (1) whether there were manifestations of intoxication; (2) the opinions of those who interacted with the defendant; (3) the trial court's independent evaluation based on observing or listening to the recorded statement; (4) the defendant's familiarity with police interview procedures; and (5) the defendant's familiarity with the *Miranda* rights. 294 Kan. at 529.

7

When the trial court relies on some of these factors, an appellate court examines only whether substantial competent evidence supports the trial court's finding. This court does not reach its own determination of voluntariness. 294 Kan. at 529-30.

We find that substantial competent evidence exists to support the district court's conclusion that Loredo voluntarily made his statement. We examine each of the considerations noted in *Gilliland*.

*Manifestations of intoxication and opinions of those who interacted with Loredo.*

As to the manifestations of intoxication and the opinions of those who interacted with him, Loredo did have an odor of alcohol on him. But Officer Clarke testified that Loredo could answer medical personnel's questions appropriately and without confusion. Officer Urbik testified that Loredo did not seem confused, could track with the conversation, and did not seem impaired by the alcohol or drugs in his system. Urbik acknowledged that believed Loredo was impaired when he first made contact with him— to the point where Loredo was unable to communicate effectively. But by the time Loredo gave his statement his condition had significantly improved.

*Familiarity with* Miranda *rights*

Loredo was familiar with his *Miranda* rights because the police advised him of them twice. Officer Urbik testified that after being at the hospital for a short time, Loredo said that he wanted to talk to the police. Urbik reminded Loredo of the *Miranda* warnings Officer Clarke read to him earlier. Urbik read the *Miranda* warnings to Loredo again. After being read the *Miranda* warnings, Loredo reiterated that he wanted to speak to Urbik.

*Observations about recorded statements*

In addition to the statements by Officers Clarke and Urbik, the court listened to Loredo's recorded statement. In his recorded statement Loredo sounds coherent, rational, and without obvious signs of serious impairment. During the conversation he was coherent, responsive to questions, could answer questions in detail, and could remember details about what had occurred earlier in the evening.

*Other factors raised*

Loredo briefly mentions his age and English comprehension as factors suggesting that his statements were not voluntary. He argues that he was only 22 years old and a nonnative English speaker. Yet Loredo offers no support for his proposition that a 22-year-old cannot voluntarily make a statement to police under similar circumstances. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018). We consider issues not adequately briefed as waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Additionally, while Loredo is not a native English speaker, substantial competent evidence exists to support the district court's conclusion that "he demonstrated fluency." He had lived in the United States since he was a small child, graduated from high school in the United States, and worked in the United States. His trial counsel considered "English . . . his primary language."

In sum, the district court did not err in denying Loredo's motion to suppress.

*The district court did not err by failing to instruct the jury on the voluntary intoxication defense.*

Loredo's second argument on appeal is that the district court erred by denying his request for a jury instruction on the voluntary intoxication defense.

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

As to issue preservation, Loredo requested that the district court instruct the jury on the voluntary intoxication defense. The district court denied Loredo's request. Accordingly, he properly preserved this issue for appeal.

We next consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318. For an instruction to be legally appropriate the requested instruction must "fairly and accurately state the applicable law." *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Loredo asked the court to instruct the jury that

"[v]oluntary intoxication may be a defense to the charge of Aggravated Burglary, when such intoxication impaired to defendant's mental faculties to the extent that he was incapable of forming the necessary intent to commit a theft."

This instruction follows the pattern instruction on voluntary intoxication as a defense to a specific intent crime. See PIK Crim. 4th 52.060 (2016 Supp.). The instruction was legally appropriate. But being legally appropriate without regard to the facts of the current case

is not enough. The instruction must also be "supported by the particular facts of the case at bar." 295 Kan. at 161.

The parties offer competing reasons why the instruction was or was not factually appropriate, mainly based on whether there was evidence that Loredo was intoxicated to the point that he could not form the requisite intent. For purposes of this appeal, we will assume that the instruction was factually appropriate and move on to the final step in our analysis, whether the failure to give the instruction was harmless. See *State v. Salary*, 301 Kan. 586, 598-99, 343 P.3d 1165 (2015) (bypassing the factually appropriate inquiry and moving straight to harmlessness).

In determining the effect of the failure to give a requested instruction, we recognize that a district court's refusal to give instructions on the law applicable to a defendant's chosen theory of defense may deny the defendant a fair trial. *State v. Wade*, 45 Kan. App. 2d 128, 135, 245 P.3d 1083 (2010). When a defendant's right to a fair trial is implicated, this court must determine whether the alleged error was harmless by determining whether the State proved beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. *State v. Verser*, 299 Kan. 776, 789, 326 P.3d 1046 (2014). We view the evidence in the light most favorable to the defendant. *State v. Friday*, 297 Kan. 1023, 1036-37, 306 P.3d 265 (2013).

After examining the entire record, we find that the State, even under the heightened constitutional standard, has established beyond a reasonable doubt that the decision to not to give a voluntary intoxication did not affect the outcome of the trial. The voluntary intoxication defense would only go to one element of aggravated burglary: whether Loredo had the mental faculties necessary to form the intent to commit a theft inside the Ebrechts' home. See K.S.A. 2018 Supp. 21-5807(b); PIK Crim. 4th 52.060.

The most telling piece of evidence the State presented on this issue was Loredo's own statement to the police. Loredo told the police that he entered the house to steal cocaine. As the district court noted at the jury instruction conference, Loredo "actually articulated the requisite intent." Additionally, evidence showed that Loredo was able to enter the Ebrechts' home through an unlocked window and evade notice when James went to check on the noise. Loredo then went upstairs, got onto the Ebrechts' bed and pinned Kelci down, causing her to wake up. Kelci started screaming and Loredo "shushed" her. When she did not stop screaming, Loredo tried to flee the house. After struggling with James, Loredo followed commands given to him by the police. Each of these actions shows some ability to plan and react to the situation as it occurred. Finally, as Loredo acknowledges in his brief, the "evidence indicated that the only reason Mr. [Loredo] broke into the Ebrechts' home was to steal cocaine."

The only evidence supporting Loredo's argument that he was too intoxicated to form the requisite intent is his own statement that he had 10 beers and cocaine. Chabira, Loredo's stepfather, who was with Loredo all evening up until he left to go the Ebrechts' home, claimed that he only saw Loredo drink a couple Coors Light beers. He did not witness Loredo ingesting or possessing any cocaine. But regardless, evidence of consumption of alcohol or drugs alone is not enough to show that a defendant could not form the intent to commit a crime. See *State v. Shehan*, 242 Kan. 127, 131-32, 744 P.2d 824 (1987) ("There must be some evidence of intoxication upon which a jury might find that a defendant's mental faculties were impaired to the extent that he was incapable of forming the necessary specific intent to commit the crime."). Loredo argues that lack of memory can be an indication that a person is sufficiently impaired. But there was no evidence at trial that Loredo was having problems remembering anything. Loredo did not testify.

Even if the district court erred by refusing to instruct the jury on the voluntary intoxication defense, the error was harmless. The State established beyond a reasonable

12

doubt, when viewing the totality of the evidence in a light most favorable to the defendant, that Loredo was capable of forming the requisite intent to commit a theft within the Ebrechts' home.

*The district court did not err by failing to instruct the jury on the defense of compulsion.*

Loredo's next argues the district court erred by not instructing the jury on the defense of compulsion. Loredo acknowledges that he did not request the instruction at trial. We note that Loredo is not arguing that counsel was ineffective for not requesting such an instruction, but that the district court erred in not instructing on the defense of compulsion sua sponte. So the essential question here is whether a district court has an obligation to instruct the jury on a defense that might be supported in the evidence without a request from the defendant. See *State v. Poore*, No. 105,726, 2012 WL 1524321, at *1 (Kan. App. 2012) (unpublished opinion). This presents purely a legal question over which we exercise unlimited review. See *State v. Ayers*, 309 Kan. 162, 163, 432 P.3d 663 (2019) (questions of law subject to unlimited review); *State v. Alvarez*, 309 Kan. 203, 209, 432 P.3d 1015 (2019) (questions of preservation and abandonment are subject to unlimited review).

We view this claim of error as much different from the failure to give a lesser included offense instruction or the failure to give an instruction on the culpable mental state necessary for a crime or some similar omission. How a defendant chooses to present his or her defense is at the sole discretion of the defense. There may be tactical reasons the defense chooses to give one instruction and omit another. "Requesting an instruction signals the trial judge that its contents are part of the defense theory. Certainly, a defendant does not have a constitutional right to have the trial judge develop the defense theory." *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012). More important, here there was a tactical reason not to rely on the compulsion defense—there was no

13

corroboration for it. To use the terms we use in our traditional examination of instructions, it was not factually appropriate under the defense theory of the case.

Here, the defense was not relying on a compulsion defense, but on an intoxication defense. Chabira is the person who Loredo claimed at the hospital had threatened to hurt Loredo's brother unless Loredo stole cocaine from the Ebrechts' basement. Chabira testified in the trial, denied such a threat, and faced no challenge by the defense over his denial. The defense instead focused on how much alcohol Chabira and Loredo had consumed that evening. In closing arguments, the defense does not rely on or mention any claim that Loredo was acting upon compulsion to protect his brother. The focus was on his level of intoxication. That was the defense strategy here. The uncorroborated story Loredo told about Chabira was just evidence of how intoxicated Loredo was. To claim now that the district court should have sua sponte given an instruction for a defense upon which there was little or no factual evidence to support and upon which the defense did not rely is, to use the words of the *Poore* panel, just "zany." 2012 WL 1524321, at \*2. We reject this claim of error.

*The district court did not err by denying Loredo's motion for a new trial based on ineffective assistance of counsel.*

Loredo argues that his trial counsel was ineffective for three reasons:  (1) for failing to present his voluntary intoxication defense through medical records or expert testimony; (2) for failing to visit and communicate with him about his trial and his associated rights; and (3) for failing to obtain an interpreter.

A district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 2018 Supp. 22-3501(1). Appellate courts review the district court's decision on a motion for a new trial for an abuse of discretion. *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018). A judicial action constitutes an abuse of discretion if (1)

14

no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

When the district court conducts an evidentiary hearing on the motion for new trial, like the court did here, this court reviews the district court's underlying factual findings for substantial competent evidence and reviews the legal conclusions based on those facts de novo. *Butler*, 307 Kan. at 853. Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). We will examine each of Loredo's specific claims of error.

*Failure to present voluntary intoxication defense through medical records or expert testimony.*

Loredo claims that his attorney should have introduced medical records and expert testimony at trial about the effects of alcohol on his behavior. By failing to do so, she

could not overcome the district court's ruling that she had not submitted sufficient evidence to support a voluntary intoxication instruction.

In ruling against Loredo on this claim of ineffectiveness, the district court noted that it reviewed the medical records Loredo claims his attorney should have introduced at trial. The court noted that Loredo's admission to the hospital was not directly related to his alcohol or cocaine use, instead it was because he was complaining of abdominal pain. Loredo tested positive for cocaine but there was no indication of how much cocaine or how it might have affected Loredo's ability to form the intent to commit a theft.

The court also noted that Loredo tested positive for alcohol an hour and a half after his arrest. In his brief, Loredo explains that his blood-alcohol content was .134 while at the hospital, but the portion of medical record containing that information was not discussed at the hearing nor is the medical record in the record on appeal.

According to the court, the medical records also stated that Loredo was "alert, oriented to person, place, time, and situation." Finally, the court found that there was "little information in the medical records to support a voluntary intoxication defense." In other words, admitting the medical records would have done little if anything to bolster Loredo's request for a voluntary intoxication instruction.

As for the testimony of an expert, Loredo proffered Dr. Barnett. The court noted that Dr. Barnett's report revealed that he believed Loredo would not have committed the crime if he were not intoxicated. But the court noted that is not the standard for the voluntary intoxication defense, instead Loredo needed to show that he could not form the requisite intent to commit the crime of aggravated burglary. As to the need for an expert to establish the effect of intoxication on a person, Dr. Barnett himself said that expert testimony is not needed to establish that an individual lacks the ability to form intent due to drug or alcohol use because "[l]ay people understand this just fine."

16

In addition, Dr. Barnett had not read all the medical reports and was under the misapprehension that Loredo was positive for methamphetamine. He did not read the police reports and did not listen to the recording of Loredo speaking with the police at the hospital immediately following the events at the Ebrechts' home.

The medical records and Dr. Barnett's report are not in the record on appeal, therefore this court cannot examine their contents. But based on the testimony provided by Loredo's trial counsel and Dr. Barnett, we agree with the district court that there was not enough evidence to overcome the presumption that Loredo's trial counsel was effective. See *Kelly*, 298 Kan. at 970.

Moreover, even if we were to conclude that Loredo's trial counsel was ineffective, Loredo fails to show that he was prejudiced. As discussed above, the evidence was overwhelming that Loredo was not intoxicated to the point where he was unable to form the requisite intent to commit aggravated burglary. Loredo fails to meet either prong of the test set out in *Strickland*. See 466 U.S. at 687. The district court's decision to deny Loredo's motion for a new trial based on ineffective assistance of counsel because of counsel's failure to introduce medical records or expert testimony at trial was not an abuse of discretion. See *Marshall*, 303 Kan. at 445.

*Failure to visit and communicate with Loredo before trial.*

Loredo next argues his trial counsel was ineffective for failure to visit and communicate with him before trial. Loredo testified that he did not know what was happening with his case until he got to court because his trial counsel would not explain anything to him. He also explained that he was concerned because his trial counsel did not meet with him at the jail in the months before his trial.

Additionally, Loredo argues that he was prejudiced because his attorney did not inform him about his rights to call witnesses. He believed that his trial counsel would call his mother, aunt, and uncle to testify on his behalf. He believed they would be able to testify about his "deteriorating mental state leading up to the night in question" and this would have supported a voluntary intoxication defense.

Finally, Loredo asserts that his trial counsel discussed his right to testify just before trial and that she told him he was better off not testifying.

But according to Loredo's trial counsel, she visited Loredo at the jail shortly after his arrest for just under an hour. At that initial meeting, Loredo's counsel discussed his charges, the penalties associated with the charges, and potential immigration consequences. She also visited Loredo at jail in July 2015, August 2015, and November 2015. Loredo's trial counsel also met with him at the courthouse before hearings.

Loredo told trial counsel early in her representation that he had no memory of what occurred at the Ebrechts' house. Accordingly, he was unable to offer any possible witnesses for trial. And as discussed above, Loredo's voluntary intoxication defense would have been unsuccessful based on the totality of the circumstances that evening.

Finally, trial counsel revealed that she informed Loredo that his testimony would be helpful in arguing his case to the jury, even if it were just to tell them that he had no recollection of the events and he made the decision not to testify. At trial, his attorney put on the record that she told Loredo that his testimony was important to a defense of voluntary intoxication and that his decision to not testify would hamper his case. Loredo explained, on the record before the district judge, that he understood but did not want to testify.

18

In reaching its conclusion to reject Loredo's claim of ineffective assistance of counsel, the district court expressed concern that Loredo's trial counsel did not meet with him in the days leading up to the jury trial. But, the court noted that Loredo failed to show prejudice from the lack of meetings. The court found Loredo's trial counsel's testimony that she informed him about certain pretrial matters credible. The court agreed that either Loredo did not offer witnesses to help his case, or his trial counsel investigated those witnesses and found them to be of no use. Additionally, the district court found that additional visits between Loredo and his trial counsel would not have been helpful because Loredo could not provide any additional information. The court found Loredo's trial counsel's testimony more credible and this court does not reweigh credibility on appeal. *Mullins v. State*, 30 Kan. App. 2d 711, 716, 46 P.3d 1222 (2002).

Finally, Loredo's assertion that his attorney did not inform him of his right to testify or the benefits or consequences of doing so is unpersuasive given the record. His trial counsel put into the record that his decision not to testify hampered her ability to defend him. After being questioned about his decision by the court, Loredo maintained that he did not want to testify. He cannot now appeal and argue that that he was prejudiced by his own fully informed and recorded decision to not testify.

Substantial competent evidence supports the district court's findings that Loredo's trial counsel was not ineffective for failure to visit with him before trial and failure to advise him of his rights regarding testifying in his own defense.

But even if this court assumes that Loredo's trial counsel was deficient under the first prong of the *Strickland* test it does not mean that Loredo was prejudiced. See 466 U.S. at 687. Again, Loredo fails to show that there was a reasonable probability that the outcome of the trial would have been different if his trial counsel visited him more often and provided him more information about his trial rights. See *Strickland*, 466 U.S. at 687. Therefore, the district court's decision to deny Loredo's motion for a new trial based on

19

ineffective assistance of counsel because not enough meetings between him and his trial counsel and lack of communication about his rights was not an abuse of discretion. See *Marshall*, 303 Kan. at 445.

*Failure to advise Loredo of his right to an interpreter and not having an interpreter present at court hearings.*

Loredo's final claim about the ineffectiveness of his trial counsel relates to her failure to explain his right to an interpreter to him and her failure to have an interpreter to assist him at trial.

This court has recognized that Kansas defendants have a statutory right to an interpreter. *Khalil-Alsalaami v. State*, 54 Kan. App. 2d 235, 239, 399 P.3d 264 (2017), *rev. granted* 308 Kan. 1595 (2018). Our state statute is clear that a qualified interpreter "shall be appointed . . . for persons whose primary language is one other than English." K.S.A. 75-4351.

In addition to the statutory right to an interpreter, there is a constitutional right to be present during criminal proceedings. The right to be present "includes a right to have trial proceedings translated into a language that the defendant understands." 54 Kan. App. 2d at 239. But this court has acknowledged that, unlike the Kansas statutory provision, the United States Constitution does not require that the court provide an interpreter in all cases in which a defendant's primary language is not English. Trial courts have wide discretion when determining whether the court must provide an interpreter to satisfy constitutional requirements. 54 Kan. App. 2d at 239.

That said, the district court did not explicitly find that Loredo's "primary language" as contemplated by the statute was English. See K.S.A. 75-4351. It is conceivable that Loredo could be fluent in English but still have a primary language other

20

than English. Assuming that Loredo's primary language is something other than English and considering the unyielding statutory requirement in K.S.A. 75-4351 requiring the district court appoint an interpreter in such situations, we must consider whether Loredo was prejudiced by his attorney's failure to insist that the court appoint an interpreter and her failure to advise him of his statutory right to an interpreter. See 54 Kan. App. 2d at 244.

In some cases, we can presume prejudice from the failure to appoint an interpreter. For example, in *Khalil-Alsalaami*, the district court found that the defendant had an excellent grasp on English and that an interpreter was not required. But on appeal this court reversed the district court's decision finding that substantial competent evidence did not exist to support the district court's finding. 54 Kan. App. 2d at 243. This court found that Khalil-Alsalaami was prejudiced by the lack of an interpreter in his case because he could not understand what was happening at trial and could not effectively participate in his own defense. 54 Kan. App. 2d at 245. His case involved complex discussions of "DNA transference and police minimization techniques." 54 Kan. App. 2d at 242. His attorneys conceded that he would not be able to understand much of the testimony.

The situation here is different. First, the district court found that Loredo was a "native of Mexico" who lived in the United States from either the age of three or the age of 12. Loredo graduated from Wyandotte High School in 2010, had no learning difficulties, and did well when he applied himself. Many of Loredo's evaluations were completed without an interpreter present. Additionally, Loredo met with his posttrial counsel five times without an interpreter present.

Moreover, the district court considered Loredo's own words and actions. For example, after police officers read him his *Miranda* rights, Loredo immediately invoked his right to remain silent. Later, when he spoke to police at the hospital, he corrected the officer when the officer misstated the facts. The district judge who heard Loredo's motion

21

to suppress found that although he was not a native English speaker, Loredo "demonstrated fluency" in English. The court was also able to consider Loredo's speech during his recorded statement to the police. And, according to the district court judge—who reviewed the hospital records from the evening of his arrest—Loredo indicated in his medical records that his preferred language for discussing health care was English. Finally, the district court found that Loredo "demonstrated a more than satisfactory grasp of the English language."

Substantial competent evidence supports the district court's finding that Loredo was essentially fluent in English. Officers testified during the trial that they had no problems communicating with him. His trial counsel testified that she spent time with Loredo making sure that he understood what she was talking about. According to his trial counsel, Loredo was comfortable and competent with English. They discussed the need for an interpreter and decided he did not need one. Loredo used no interpreter for most of his meetings with his attorneys, including his attorney at the time of the hearing on a motion for new trial. While an interpreter was present, the record reflects that his assistance was not required. For example, when Loredo was testifying at the hearing the interpreter interrupted and asked the court if translation was necessary because "he seems that he understands all of it." Later, the attorney for the State noted that the interpreter had not been interpreting because Loredo was answering the questions so quickly.

Given the evidence presented, coupled with the undisputed evidence of Loredo's own ability to understand English and participate in his own defense, there is no reasonable probability that the outcome of the trial would have been different had an interpreter been available to Loredo throughout his case. See *Strickland*, 466 U.S. at 687. Accordingly, the district court did not abuse its discretion when it denied Loredo's motion for a new trial based on ineffective assistance of counsel because counsel did not inform him of his right to an interpreter or her failure to have an interpreter present at all court proceedings. See *Marshall*, 303 Kan. at 445.

Finding no reversible error by the district court, we affirm Loredo's convictions.

Affirmed.