IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,436

STATE OF KANSAS,
*Appellee*,

v.

DALE M. WILLIS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The invited error doctrine prevents this court from reviewing instruction errors—even as clearly erroneous under K.S.A. 2019 Supp. 22-3414(3)—when the defendant requests and agrees to the wording of the instruction.

2.

Lay opinion testimony is permissible if it: (1) was rationally based upon the witness' perceptions; (2) helped create "a clearer understanding of the testimony of the witness"; and (3) was "not based on scientific, technical or other specialized knowledge." See K.S.A. 2019 Supp. 60-456(a).

3.

Internet searches for a handgun, the same type and caliber used days later in a shooting, demonstrates "a sufficient similarity between" the content of the internet searches and shell casings recovered from the scene of the shooting to make evidence of the searches relevant.

4.

A district court cannot improperly weigh aggravating and mitigating circumstances contrary to K.S.A. 2018 Supp. 21-6620(c)(1)(A) and *State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015), if no mitigating circumstances exist.

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed September 25, 2020. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Dale Willis directly appeals from his convictions for first-degree murder and battery. Willis claims the district court committed nine reversible errors. We consolidate Willis' claims into (1) jury instruction errors, (2) prosecutorial errors, (3) evidentiary claims, and (4) sentencing issues. Finding none constitute reversible error, we affirm the district court.

FACTS AND PROCEDURAL BACKGROUND

On September 16, 2015, Jurl Carter and his friends attended a concert at the Roxy bar in Overland Park. The group arrived at the venue a little after midnight. Carter parked his car next door at the 24-Hour Fitness center because the bar's parking lot was full. The friends watched several performers and then planned to leave the event. Carter brought his vehicle from the 24-Hour Fitness parking lot to a now-vacant space in front of the

2

Roxy to pick up his friends. As Carter entered the spot, he accelerated too rapidly and pulled in too far. The front of his car nearly hit Dale Willis, who was standing with a different group on the sidewalk. Carter exited his vehicle and apologized to Willis, who did not respond and walked away.

Then, as Carter and his friends were posing for photographs outside the Roxy, Dale Willis struck Carter on the side of the face with a "sucker punch." Carter fell to the ground. He stood up and cautiously got into his car. As Carter was attempting to leave, Willis pointed three times at Carter signaling to another man later identified as Willis' brother, James Willis. The brothers walked to the passenger side of the car, and James Willis fired between 10 and 20 rounds from a pistol into the passenger side door and window. Dale and James Willis then fled together. Carter died as the result of several center body mass gunshot wounds.

At trial, the State's theory was that Willis had aided and abetted James Willis in the premeditated murder of Carter. The State relied on the circumstances surrounding the shooting, including: (1) the fact that Carter had angered Willis by driving too close to him; (2) that Willis had punched Carter; (3) that a short time later, Willis had pointed out Carter to James Willis; (4) that the brothers approached the car when Carter was attempting to leave; and (5) that the brothers had fled together.

The State also introduced evidence through Federal Bureau of Alcohol, Tobacco, and Firearms Agent Steven Lester detailing the organizational structure of Dale Willis' rap LLC "Duced Out Records" (DOR). According to Agent Lester's testimony, Willis served as DOR's "[l]eader, CEO, [and] . . . business manager." Agent Lester testified that James Willis provided "some type of security" for Willis and other DOR organization members. Further, Agent Lester explained that DOR members received a DOR medallion as evidence of membership and that both Dale and James held medallions.

3

The State also presented eleven .45 auto caliber cartridges fired from the same Glock handgun recovered in and around Carter's Malibu. James Willis' Galaxy Note cell phone was entered by stipulation. The cell phone contained web page visits to Walmart.com and Cabelas.com viewing .45 automatic caliber ammunition; a Google search for a Glock 21 handgun with a 30-round magazine; and ClassicFirearms.com searches viewing magazines for a Glock .45 caliber handgun. The phone also contained searches for pictures of two Glock .40 caliber handguns and one Glock .45 caliber handgun. These searches occurred several days prior to the shooting. Further, the phone logged a KCTV5 news report discussing the shooting of Carter.

Willis offered alternative defenses at trial. He claimed first that James Willis acted alone and not at the behest or with the help of Willis. Alternatively—and importantly for this appeal—Willis claimed that if he had acted in concert with James Willis, he did so in self-defense. Along these lines, Willis argued that Carter had a gun with him and intended to shoot Willis after the initial punch was thrown. Gerald Greenfield, who worked security at the Roxy, testified Carter said he "got something for y'all" after Willis punched Carter. Greenfield believed this statement meant Carter intended to shoot Dale Willis. Other witnesses testified for the defense that Carter motioned to his waistband as if he had a concealed firearm, but no one actually saw a weapon.

A jury convicted Willis of first-degree murder and battery. The district court imposed a hard 50 sentence for the murder conviction and a concurrent 6-month sentence for the battery conviction.

Willis directly appeals.

DISCUSSION

On appeal, Willis claims nine reversible errors. Several of Willis' claims overlap and intersect, however, so we regroup his claims into four categories: (1) jury instruction errors; (2) prosecutorial errors; (3) evidentiary issues; and (4) sentencing issues. We find no error and affirm the district court.

*Jury Instruction Error Claims*

Willis requested a series of aiding and abetting and self-defense instructions. After the court agreed to give those instructions, Willis never objected or indicated he wasn't happy with the instructions he requested.

Jury Instruction No. 11 mirrored PIK Crim. 4th 52.140 (2018) and informed the jury on "Responsibility for Crimes of Another":

> "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime advises, hires, counsels or procures another to commit the crime.

> "All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

Jury Instruction No. 13 adopted language from PIK Crim. 4th 52.200 (2016 Supp.) and discussed "Use of Force in Defense of a Person":

> "As to Count I, defendant claims his use of force was permitted as self-defense.

"Defendant is permitted to use physical force against another person that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense, there is no requirement to retreat."

Jury Instruction No. 14 laid out the elements of first-degree murder:

"The defendant is charged with murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant intentionally killed Jurl Carter.
2. The killing was done with premeditation.
3. This act occurred on or about the 16th day of September, 2015, in Johnson County, Kansas."

These instructions make it clear that Willis was permitted to argue that he acted in self-defense. If the jury agreed that Willis reasonably believed that deadly force was necessary to prevent his own death or great bodily harm from Carter's imminent use of unlawful force, then the jury would be required to acquit. The way the instructions read and the evidence was presented, the fact that James Willis was the trigger man would not have prevented the jury from accepting Willis' self-defense claim.

At trial, however, Willis wanted to argue to the jury that it was actually James Willis who had the reasonable belief that deadly force was necessary in light of Carter's

imminent use of unlawful force. But that argument lay outside the jury instructions and the district court made several rulings holding the parties to the jury instructions as given. As a result, on appeal, Willis now claims those instructions were wrong or misinterpreted by the district court to the extent they prevented him from arguing that James Willis—as opposed to Dale Willis—acted in self-defense.

Under the invited error doctrine, a litigant may not invite error and then complain of that same error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). We have explained that a defendant cannot challenge an instruction on appeal when there has been an on-the-record agreement to the wording of the instruction at trial—as there was here. *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012). Contrary to Willis' assertion in his appellate brief, the invited error doctrine prevents us from reviewing these instructions even for clear error under K.S.A. 2019 Supp. 22-3414(3). See 294 Kan. at 393 (explaining that a defendant cannot challenge a *requested* instruction as clearly erroneous, even under K.S.A. 22-3414[3]).

As such, to the extent any of Willis' claims on appeal are actually an attack on the jury instructions themselves, those claims are barred by the invited error doctrine. In a closely related argument, Willis contends that the district court erred when ruling on several objections related to how to interpret these instructions.

During closing arguments, Daniel Ross, Willis' counsel, described defense of another person and claimed during his closing arguments that "a person in danger [who] reasonably believe[s] a person is armed and represents a significant danger to you or something else" has the right to use lethal "force to prevent injury to yourself or somebody else." The State made its first objection, noting that the self-defense instruction applied only to Dale Willis. The district court sustained the objection and instructed Ross to follow the self-defense instruction as it was written.

7

Ross directed the jury to follow the district court's instructions, "not Dan Ross's [*sic*] interpretation of the instructions." However, Ross then repeated "[i]f a person is acting under the circumstances as they believe to be true, you get to use that level of force. And we believe that is what James Willis did in this case." The State again objected and the district court again sustained the objection and implored Ross to "keep it contained to the facts in this case."

Finally, during the State's rebuttal, the prosecutor applied Jury Instruction No. 13 to Dale Willis only—stating that "Dale Willis [was] permitted to use physical force against another person, which is [Carter] . . . when and to the extent that it appears to him . . . that the defendant reasonably believes such force is necessary to prevent death or great bodily harm to himself, the defendant, from the other person's imminent use of unlawful force."

Ross objected and explained that Jury Instruction No. 11 described "criminal responsibility for [a] crime committed by another." He elaborated that "the essence of the State's theory . . . [was] that this defendant encouraged James Willis to commit this offense" and that Dale Willis must have done so with the same culpable mental state as James Willis. He posited that "[m]ental culpability includes James Willis. That includes his reaction or perception and ability to engage in self-defense." The State retorted that Ross' comparison of self-defense and aiding and abetting theory was "talking apples and oranges" because "[s]elf-defense in Kansas does not transfer." In response to this exchange, the district court reiterated that Instruction No. 11 described aiding and abetting and that this was not "an issue of self-defense of others. This is self-defense asserted towards this defendant." Ultimately, the district court overruled Ross' objection.

Lower court rulings on objections are reviewed on appeal for abuse of discretion. *State v. Miller*, 284 Kan. 682, 709, 163 P.3d 267 (2007). Discretion can be abused in one of three ways. A judicial action constitutes an abuse of discretion if:  (1) no reasonable

8

person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). Here we can discern no abuse of discretion. The district court's rulings properly confined the parties to the jury instructions. To the extent Willis is actually claiming a legal error in the instructions themselves, such a claim would again be barred by the invited error doctrine. Nothing the district court did prevented Willis from arguing to the jury exactly what the instructions permitted him to argue—that Dale Willis acted in self-defense.

Willis then makes two final jury instruction claims. He briefly suggests that Instruction No. 13 failed to fully explain to the jury how the affirmative defense of self-defense operates. And he directly attacks the wording of Jury Instruction No. 11—the aiding and abetting instruction—by contending that the term "mental culpability" was undefined and unexplained by the district court's other instructions. Put another way, he claims that no instruction informed the jury "that to find Dale Willis guilty of premeditated murder, it must find beyond a reasonable doubt that Dale and James Willis shared the same intent, i.e., a premeditated intent to kill Jurl Carter."

But merits aside, we emphasize again that Willis requested all of these instructions. He concedes as much in his appellate brief. Willis accepted the resulting instructions and failed to raise any objection at the instructions conference. He cannot be heard to complain now on appeal. See *Verser*, 299 Kan. at 784; *Peppers*, 294 Kan. at 393.

*Prosecutorial Error Claims*

Next, we consider several statements Willis alleges were reversible prosecutorial error. These statements include: (1) a joke about how lawyers "add things and confuse things"; (2) allegedly erroneous statements concerning self-defense; and (3) a number of

9

instances of misstating the evidence or arguing facts not in evidence. We hold that none constitute reversible error.

We review prosecutorial error claims under a two-step analysis:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

First, we find the lawyer joke was not prosecutorial error. While explaining the concept of lesser-included offenses, the prosecutor said: "Now you heard us talk about lesser-included offenses because we're not lawyers unless we're trying to just add things and confuse things." Willis claims this comment constitutes reversible error because it inflamed the jury's prejudices and diverted its attention from deciding the case based upon evidence and law. Without a further explanation, Willis asserts this joke prejudiced his case.

10

Jokes are typically permissible as part of closing arguments. See, e.g., *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002 (Ct. App. 1991) ("Thus, in making his or her concluding oration, the prosecuting attorney may resort to poetry, cite fiction, reference anecdotes or tell jokes."); *Gaede v. State*, 801 N.W.2d 707, 710 (N.D. 2011); *People v. Beck*, No. A135537, 2013 WL 6688965, at *5 (Cal. Ct. App. 2013) (unpublished opinion); *United States v. Robinson*, 404 Fed. Appx. 77, 81 (7th Cir. 2010) (unpublished opinion) (holding a joke that maybe one day the defense counsel will turn his life around and become a prosecutor was "[a] harmless joke" that "neither disparaged the credibility of the defense counsel nor shifted the jury's attention from the legal issues"); *United States v. Haque*, 315 Fed. Appx. 510, 520 (6th Cir. 2009) (unpublished opinion) (finding that the joke 2 plus 2 equals "what do you want it to be?" was not error in an accounting fraud case); *Lawson v. Sec'y DOC*, No. 2:16-CV-85-FTM-29MRM, 2017 WL 4271664, at *11 (M.D. Fla. 2017) (unpublished opinion) (noting, "Counsel's comment that he 'could do [closing argument] in ten [minutes], but [the court reporter] won't like having to type it all down' was a joke."), *aff'd* No. 17-14802, 2019 WL 4058600 (11th Cir. 2019) (unpublished opinion).

Even barbs disparaging lawyers have passed muster. See *McDaniel v. McCall*, No. CIV.A. 1:09-1348-MBS-SVH, 2010 WL 3824708, at *15 (D.S.C. 2010) (unpublished opinion) (finding a lengthy joke involving a lawyer and a preacher harmless), *report and recommendation adopted* No. CIV.A. 1:09-1348-MBS, 2010 WL 3824643 (D.S.C. 2010); *People v. Warren*, No. G050393, 2014 WL 5144761, at *2 (Cal. Ct. App. 2014) (unpublished opinion) ("'And so ladies and gentlemen, what I'm reminded of when I hear [defense counsel's] closing argument is an old lawyer joke. . . . You know, if the facts aren't on your side, well, then you argue the law. If the law isn't on your side, well, then you argue the facts. And if neither the facts nor the law are on your side, what do you do then? Well, you just argue.'").

11

We do not find this self-deprecating lawyer joke to be outside the wide latitude afforded attorneys to explain their case to the jury. This comment was not error.

Second, Willis complains about three statements the State made about the self-defense instructions. Willis recapitulates his objection to the State's insistence that the only self-defense theory the jury was permitted to consider in this case was Dale Willis' self-defense—not James Willis' self-defense. We have already considered these claims in the context of the jury instructions. As above, we conclude that both the State and the district court were correct that the jury instructions—instructions requested by the defendant—limited Willis' case to arguing that he acted in self-defense. The prosecutor's statements to this effect were not error.

Lastly, Willis argues that at several points, the prosecutor misstated the evidence or argued facts not in evidence. We will consider each statement in turn. At one point, the prosecutor said that Agent Lester had testified that any meeting between Willis and his business rival, Tyrone "Bird" Brown, would have "fatal results." Willis now argues this was a mischaracterization of Agent Lester's testimony. But both Agent Lester and Brown testified that violence would likely result if Willis and Brown ran into one another. Agent Lester stated the two meeting "could lead to a very violent confrontation." Brown described himself as "a competitor in the rap music scene" and that if he and Willis were in the same place, things "could turn violent between the two of [them]." The prosecutor's statement was supported by the testimony and falls within the "wide latitude" afforded "prosecutor[s] to make reasonable inferences based upon the evidence." *State v. Coones*, 301 Kan. 64, 82-83, 339 P.3d 375 (2014). Testimony supported the notion that "fatal results" could occur should Willis and Brown clash. No error occurred.

Willis also objects to the State's claim that there was no argument between Willis and Carter before Willis punched Carter. The prosecutor said:

"I submit to you at that point in time there is not an argument going on. It has cooled down. Because do you really think *that somebody who kills for his brother* is going to have his back turned when his brother is engaged in a fuck-you-no-fuck-you type of argument?" (Emphasis added.)

Willis contends this comment inferred that Willis was a violent person, "[e]ven though no one is dead at the point of the punch." Willis also argues this statement implies that James previously killed for Willis. The defense was attempting to demonstrate that there had been a brewing conflict between Willis and Carter prior to the punch, as a way of bolstering its self-defense theory. In rebuttal, the State was attempting to argue that, based on the evidence, this was unlikely. It was a fair comment on the evidence in the midst of disputed interpretations of what happened.

Likewise, the phrase "somebody who kills for his brother" was clearly a reference to James Willis shooting Carter. It was not an effort to bring a prior hypothetical killing into the picture. These comments were not error.

Willis next takes issue with this comment:

"And when asked if he would have entered that car had he known the driver was Dale Willis, what was his response? No. And I say why. And he said, 'Because he just killed my friend.' I submit to you had Demitrius Parker figured out who the driver of that vehicle was that night, *that car ride would have ended very, very differently*." (Emphasis added.)

The person the State was referencing was Carter's friend Demitrius Parker. Parker had fled the scene after Carter had been shot and was ultimately picked up by Willis. Parker testified he did not know who the driver was, or he would not have accepted a ride from Willis "[b]ecause [Willis] had just got done killing" his friend Carter.

13

Willis now claims that the prosecutor's argument that if Parker had known who Willis was, the car ride would have "ended very, very differently" was not supported by the evidence. While it is true that Parker did not use these specific words, we do not find the State's characterization of the testimony to be inaccurate or unfair. Not accepting the ride would have necessarily meant that the ride would have ended differently. The prosecutor did not err.

Finally, Willis argues it was error for the prosecutor to talk about "street law" during closing arguments. The State argued to the jury:

"That is when we move into the concept of street law. And to be clear, I submit to you that is not the law you will receive in your jury instruction packet. Street law isn't the law in Kansas. Because someone disrespects you doesn't mean you get to kill them. The law of the streets. Remember what Demitrius Parker talked about. You take care of it that night. You take care of it right then. Because you don't want to be facing something in the future. You don't want to be looking over your shoulder. You are not going to find that type of self-defense in your jury instructions packet.

"*Antonio Frazier talked about it, too. He said the victim deserved it because he egged it on.* There were statements—just statements he didn't see a gun. In fact he was saying that [Carter] was making these comments to everyone out there. [Carter] didn't have a gun. This was about street law, and that is not the law in Kansas." (Emphasis added.)

Willis suggests the prosecutor made up the notion of "street law" and claims Antonio Frazier actually testified that "[n]o one deserved to die like that." Although seemingly contradictory, Frazier made *both* points—that Carter had to die after "egging on" Willis and that Carter did not deserve to die in that manner. On cross-examination, Frazier explained that Carter did not deserve to die by gunfire, but that Carter's death was the appropriate punishment for disrespecting Willis in front of members of the rap

14

community. Frazier told the jury that Willis "felt disrespected" by the earlier run-in with Carter "and wanted to keep [his] image."

Using the phrase "street law" as a euphemistic way of summarizing Frazier's testimony was not inaccurate. And Frazier did say Carter egged on Willis and had to die as a result. The State's comment was supported by evidence and fell within the broad discretion we afford prosecutors. See *Coones*, 301 Kan. 64, 82-83.

*Evidentiary Issues*

We turn now to Willis' evidentiary arguments—that the district court erroneously admitted testimony about DOR and the contents of James Willis' Galaxy Note smartphone.

Willis argues Agent Lester's testimony—specifically his conclusion that James Willis provided security services for DOR—should not have been permitted. At trial, Willis objected to the foundation for Agent Lester's testimony. The State explained it wished to play several DOR music videos for the jury to demonstrate James Willis' association with and role within DOR, but could not do so under a motion in limine due to the videos' inadmissible violent content. As a workaround, the district court permitted the State to voir dire Agent Lester to form the foundation for his testimony. Agent Lester listed the bases for his conclusion, including surveillance videos, Facebook, Snapchat, and Instagram posts, DOR rap videos, and interviews. Agent Lester described how James Willis was not a performer in these videos, often stood to the side, and sometimes possessed a firearm. With these facts, Agent Lester surmised that James Willis performed some security role. Ultimately, the district court permitted Agent Lester to testify on the subject, and his trial testimony was consistent with his voir dire testimony.

15

On appeal, Willis contends that Agent Lester's testimony exceeded the scope of a normal juror's understanding and thus was not permissible unless Agent Lester had been qualified as an expert witness. Willis concludes that this error prejudiced his case because Agent Lester provided the only account suggesting that James Willis provided security services for Willis and DOR.

Whether a witness is qualified to provide expert or lay opinion testimony is "determined by the trial court in the exercise of its discretion." *State v. Sasser*, 305 Kan. 1231, 1243, 391 P.3d 698 (2017). A judicial action constitutes an abuse of discretion if no reasonable person would take the view adopted by the trial court or if it is based on an error of law or fact. *Marshall*, 303 Kan. at 445.

Expert opinion testimony is generally admissible if it aids the jury with unfamiliar subjects or interpreting technical facts, or if it assists the jury in arriving at a reasonable factual conclusion from the evidence. *State v. Gaona*, 293 Kan. 930, 948, 270 P.3d 1165 (2012). Expert testimony is unnecessary if the normal experience and qualifications of jurors allows them to draw proper conclusions from the provided facts and circumstances. *State v. Wells*, 289 Kan. 1219, 1236, 221 P.3d 561 (2009).

To distinguish between lay opinion and expert opinion testimony and to adopt the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the Kansas Legislature adopted K.S.A. 2019 Supp. 60-456(a)-(b):

> "(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Here, the parties agree Agent Lester testified as a lay witness providing opinion testimony. In his brief, Willis notes that the district "court acknowledged this was opinion testimony" and that "the district court refused to find Agent Lester to be an expert." Much the same way, the State concluded that "the district court did not find Agent Lester to be an expert on this area, thus the rules pertaining to expert testimony are irrelevant here." We agree. As such, Agent Lester's opinion testimony was permissible if: (1) it was rationally based upon his perceptions; (2) helped create "a clearer understanding of the testimony of the witness"; and (3) was "not based on scientific, technical or other specialized knowledge." K.S.A. 2019 Supp. 60-456(a).

We hold the district court did not abuse its discretion when it permitted Agent Lester to testify as to James Willis' role within DOR. Following K.S.A. 2019 Supp. 60-456(a)'s framework, Agent Lester's testimony was rationally based upon his perceptions. Agent Lester laid sufficient foundation, including pole-camera surveillance, social media postings, and approximately 10 official rap videos published by DOR. Moreover, Agent Lester performed several witness interviews and reviewed James Willis' criminal history. In the videos, James Willis was not a performer or singer, and sometimes held a firearm. Additionally, Agent Lester observed James Willis with a gun at the scene of a prior shooting and viewed a photograph of DOR members, with James Willis posing as if he held a handgun. Based upon these observations, Agent Lester concluded that in his opinion, James Willis was DOR's "muscle."

17

Agent Lester's testimony helped the jury understand DOR's structure. He explained Dale and James Willis' financial relationship—that in exchange for Dale Willis' financial support, James Willis provided DOR "some type of security." Agent Lester listed each DOR member and their respective roles, DOR's hierarchy, and the importance of DOR medallions.

Finally, Agent Lester's observations were not based upon "scientific, technical or other specialized knowledge." K.S.A. 2019 Supp. 60-456(a). In *Sasser*, a motorcycle owner testified to the motorcycle's value and estimated the monetary damage to the motorcycle after Sasser knocked the bike over. Sasser objected to the owner's damage estimation, claiming the owner was not qualified to provide a dollar amount. The district court considered the owner's account "as lay opinion testimony." 305 Kan. at 1246.

We found no abuse of discretion. 305 Kan. at 1246-47. In our analysis, we noted that the motorcycle owner's "testimony . . . was rationally based on his perception of what he saw when the police asked him to inspect [the] motorcycle." 305 Kan. at 1246. Even though the owner provided a dollar figure to estimate the damage to the bike, his conclusion "was not based on information that was so scientific, technical, or specialized that it cried out for greater court control." 305 Kan. at 1246-47.

Like the motorcycle owner in *Sasser*, Agent Lester's testimony was professional, but not "so scientific, technical, or specialized that it cried out for greater court control." 305 Kan. at 1246-47. An average lay person would have been able to observe the same video, social media, interviews, and picture information and conclude which DOR members performed which functions within the organization.

While the third prong of K.S.A. 2019 Supp. 60-456(a)'s analysis is the closest call, we are not convinced the gloss provided by Agent Lester's testimony transformed it into

18

expert opinion testimony in light of each factor discussed here. Accordingly, we hold the district court did not abuse its discretion in permitting Agent Lester's testimony.

Willis also challenges the district court's admission of the gun and ammunition searches found on James Willis' smartphone. At trial, Willis objected to the searches as both more prejudicial than probative and as irrelevant to the case. The district court overruled Willis' objection, finding the searches relevant and more probative than prejudicial. Now, Willis simply claims that James Willis' searches for guns and ammunition on his smartphone one week prior to Carter's death was not relevant.

Generally speaking, all relevant evidence is admissible. K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as evidence having "any tendency in reason to prove any material fact." See *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). We typically describe relevant evidence as evidence that is both material and probative. Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). We review materiality determinations de novo. *Page*, 303 Kan. at 550. "Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.'" *McCormick*, 305 Kan. at 47. Even if evidence is relevant, a trial court has discretion to exclude it where the court finds its probative value is outweighed by its potential for producing undue prejudice. See K.S.A. 60-445. An appellate court reviews any such determination for an abuse of discretion. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). A trial court abuses its discretion when it adopts a view no reasonable person would take or takes an action based upon an error of law or of fact. *Marshall*, 303 Kan. at 445.

We have previously considered the relevance of handgun-related evidence. In *State v. Scott-Herring*, 284 Kan. 172, 159 P.3d 1028 (2007), police failed to locate a firearm at a homicide scene. Despite this, the State admitted a photograph of Scott-

Herring holding a revolver during its case-in-chief. A firearms expert testified at trial that four types of revolver could have fired the .38 Special caliber bullet that killed the victim, and that "the general appearance of the gun in the photograph was similar" to those revolvers. 284 Kan. at 175. Unfortunately, the expert could not definitively match a bullet recovered from the victim to Scott-Herring's gun.

On direct appeal, Scott-Herring argued that "the photograph was unduly prejudicial because the State could only speculate that it was the murder weapon." 284 Kan. at 175. We disagreed. We held the picture of Scott-Herring with the revolver was "relevant to establish his possession of a gun resembling the possible murder weapon." 284 Kan. at 177. Moreover, we stressed that relevance is a generally low threshold and that "the State was not required to prove that the gun in the photograph was the actual murder weapon for the evidence to be admissible." 284 Kan. at 177. Most importantly, we continued that "[i]f there is testimony indicating a *sufficient similarity* between the weapon used to commit the charged crime and a weapon shown to be in the defendant's possession, 'the lack of testimony positively identifying the weapon as that used in the crime goes to the weight, not the admissibility, of the evidence.'" (Emphasis added.) 284 Kan. at 177 (quoting *State v. Trammell*, 278 Kan. 265, 282, 92 P.3d 1101 [2004]). Correspondingly, we held Scott-Herring's claim meritless. 284 Kan. at 177.

We find *Scott-Herring* dispositive here. A substantial amount of witness testimony presented "a sufficient similarity between" the .45 caliber ammunition and Glock handguns from the internet searches and those used in the shooting. 284 Kan. at 177. Ten .45 caliber shell casings were recovered around Carter's vehicle and one casing was inside the car. Forensic scientist expert Jason Butell determined that the 11 shell casings recovered from the Roxy's parking lot were fired from the same Glock handgun. Later, Butell provided a detailed examination of Glock handguns and determined the shooter

used a Glock .45 caliber handgun in the full size, subcompact, slimline, or competition variants. Butell then eliminated certain Glock models only capable of firing less than 11 rounds due to their magazine size. He determined the handgun was either a Glock Model 41, 30, or 21.

James Willis' smartphone contained searches for .45 caliber ammunition compatible with Glock handguns, the Glock Model 21, and several searches for Glock magazines carrying over 11 rounds. That James Willis performed internet searches for the same caliber ammunition and one of the three possible handgun models used in the shooting (the Glock .45 Caliber Model 21) just days prior creates a "sufficient similarity" between the searches and evidence recovered from the scene. See *Scott-Herring*, 284 Kan. at 177.

Furthermore, we held in *Scott-Herring* it was not error to admit a single photograph of the defendant with a revolver which bore the "general appearance" of four handguns capable of firing the ammunition used in a murder. 284 Kan. at 175, 177. Here, James Willis searched for the exact model of three possible handguns and repeated searches for the same variety of ammunition. The similarities between James Willis' searches and the firearm and ammunition used in Carter's shooting bear a much stronger correlation and therefore were relevant. See 284 Kan. at 177.

Because there was a sufficient similarity between the guns and ammunition depicted in the internet searches and the ammunition recovered at trial, we hold the evidence was relevant and the district court did not err in permitting the smartphone evidence.

*Cumulative error did not deny Willis a fair trial.*

In the last of his trial-phase claims, Willis asserts cumulative error denied him a fair trial. Because we have found no error during Willis' trial, the cumulative error doctrine does not apply. *Marshall*, 303 Kan. 451; see also *State v. Blansett*, 309 Kan. 401, 402, 435 P.3d 1136 (2019) (explaining that under the cumulative error doctrine, the court must identify "multiple errors to accumulate").

*Sentencing Issues*

For the first of Willis' two sentencing-phase complaints on appeal, he argues the district court failed to comply with K.S.A. 2019 Supp. 21-6620(c)(1)(A) when it imposed a hard 50 sentence. Prior to sentencing, Willis moved for a downward durational departure to a hard 25 sentence and provided justifications he believed supported the departure. Willis claimed he did not have a gun and did not shoot Carter; he did not play an "active role" in the shooting; and argued that the public would be sufficiently protected by a 25-year prison term.

The district court explained that those same justifications could also cut the other way:

> "[T]he fact that . . . Dale Willis[] was not in possession of a handgun, was not the one who pulled the trigger, *can also be considered an aggravating factor under K.S.A. 21-6815*; that this was a murder committed with two or more participants in this criminal conduct, and that this defendant, Dale Willis, played a major role as the leader or director, if you will, of the shooter, James Willis.

"Mr. Willis, as you stated, the jury has rendered its verdict. They found beyond a reasonable doubt that you were not only involved but that it was a premeditated act for the shooting and death of Jurl Carter. From the totality of all the evidence that I have heard in this case, that verdict is well-supported by evidence. I understand your exercising your right to go to trial. You were convicted by the jury. Your continued disavowing of any involvement in this does not match up with the evidence that was presented here.

"To find a departure to reduce the time in which you must serve in prison before being eligible for parole must be substantial and compelling. *I would say that the contrary would be substantial and compelling to show that there are aggravating circumstances not mitigating circumstances for your request for leniency in this case*." (Emphases added.)

Willis posits the district court's reference to "aggravating" factors violated K.S.A. 2019 Supp. 21-6620(c)(1)(A) and *State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015), because it is unclear whether the district court impermissibly weighed aggravating and mitigating factors against one another.

We are convinced no error occurred. The district court explained Willis' first-degree murder conviction and its appropriate sentencing provisions. It discussed Willis' downward durational departure motion and listed the justifications Willis provided for that departure.

The district court then examined the nonexclusive list of mitigating factors provided in K.S.A. 2018 Supp. 21-6815(c)(1)(A)-(F) and concluded that none applied to Willis' case. It noted that "Willis certainly does not fall under the acceptance of responsibility as evidenced by his statement here today." The district court explained that factors raised by Willis could be interpreted as cutting against his claim for leniency. It is clear the district court found no mitigating factors. As such, the court was not weighing mitigating factors against aggravating ones. The district court reiterated the standard that

23

"to find a departure to reduce the time in which you must serve in prison before being eligible for parole must be substantial and compelling." The court found that none of the factors listed by Willis were convincing and believed they all cut the other way—as substantial and compelling aggravating circumstances. The district court then sentenced Willis to the hard 50 term.

Simply put, the district court could not impermissibly weigh aggravating and mitigating circumstances because it did not find any mitigating factors. We find no abuse of discretion here.

Finally, Willis objects to several of the district court's comments during sentencing. These comments include: "Mr. Willis certainly does not fall under the acceptance of responsibility as evidenced by his statement here today." And: "I understand your exercising your right to go to trial. You were convicted by the jury. Your continued disavowing of any involvement in this does not match up with the evidence that was presented here." Willis argues, without authority, that the district court's reference to accepting responsibility violated his right to remain silent under the Fifth Amendment. Although Willis offers caselaw to support the rule "[t]he right to remain silent extends to the sentencing phase of criminal trials[,]" he fails to provide any authority for his assertion that the district court's statement somehow violated Willis' Fifth Amendment rights.

We deem issues not adequately briefed as waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Moreover, a point raised only incidentally in a brief, but not argued therein, is also abandoned. *State v. Sprague,* 303 Kan. 418, 425, 362 P.3d 828 (2015). An appellant's failure to support a point with pertinent authority is akin to failing to brief the issue. *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018).

Not only was the district court commenting directly on statutorily described mitigating circumstances, any claim that these comments somehow violated Willis' right to remain silent are deemed abandoned.

There was no sentencing error.

Affirmed.

NUSS, C.J., not participating.[1]
MICHAEL E. WARD, District Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Chief Justice Lawton R. Nuss heard oral arguments but did not participate in the final decision in case No. 117,436. Chief Justice Nuss retired effective December 17, 2019.

[2]**REPORTER'S NOTE:**  District Judge Ward was appointed to hear case No. 117,436 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.