IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,451


STATE OF KANSAS,
*Appellee*,


v.


JAMES A. WILLIS,
*Appellant*.


SYLLABUS BY THE COURT


1.

When determining whether a prosecutor engaged in erroneous conduct, an appellate court considers whether the challenged act falls outside the wide latitude a prosecutor has to conduct the State's case and attempt to obtain a conviction in a manner that does not prejudice the defendant's constitutional right to a fair trial.


2.

A prosecutor may argue that facts do not support defense theories, including a theory of self-defense.


3.

When a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous.

4.

Under the clear error standard, the reviewing court must be firmly convinced the jury would have reached a different verdict if the permissible instruction had been given.

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Oral argument held September 11, 2024. Opinion filed October 18, 2024. Affirmed.

*Kristen B. Patty*, of Wichita, argued the cause, and *Catherine M. Decena Triplett*, of Triplett Law Firm, of Shawnee, was on the brief for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Kris W. Kobach,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: James A. Willis appeals from his convictions for first-degree premeditated murder and criminal possession of a firearm. He asserts errors revolving around his trial theory that he was acting in self-defense or defense of another. Finding no reversible error, we affirm the convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Willis was convicted of premeditated first-degree murder for firing multiple shots at close range into a car as the driver was backing out of a parking lot; he was also convicted of criminal possession of a firearm. His brother Dale Willis was convicted in a separate trial for the same murder as an abettor of first-degree murder and battery, and his convictions were affirmed in *State v. Willis*, 312 Kan. 127, 475 P.3d 324 (2020).

The inconsistency of witness testimony complicates a description of the events surrounding the shooting. To avoid confusing the two, the Willis brothers will be

referenced as either James or Dale. The shooting took place at night in a small parking lot outside a nightclub in Overland Park. As the victim, Jurl Carter, was backing his car out of his parking space, James ran after him and shot into the car, killing him. The scene was chaotic, with dozens of people in the lot at the time of the shooting, and with many of them running or driving from the scene immediately afterwards. Witnesses subsequently differed in their versions of what happened, with some witnesses reporting there was more than one shooter, and a defense witness even testifying that four or five men ran after Carter's car.

But a surveillance camera at a nearby store captured the scene. And the witness accounts were in general accord, which, when compared with the video recording, allows a reasonable composite of what happened. Furthermore, James conceded at trial that he ran to Carter's car and fired numerous shots into it, although he disputed the State's theory of his motivation for doing so.

On the night of September 15, 2015, through early morning September 16, Dale was at The Roxy bar, a popular locale for music and dancing in Overland Park, where he performed on the stage. Around midnight, Carter, who was also a musical performer, picked up a couple of friends and went to the bar, where he spent some time dancing. About an hour later, Carter and his friends went outside and lounged outside the bar.

Shortly after midnight, Dale texted James, who was not at the club, saying: "Sucka here." Shortly afterwards, James sent Dale a text reading: "On the way." James received a ride to The Roxy from a friend, whom he told that Dale had "got into it with somebody." Witnesses confirmed that Carter and Dale engaged in a verbal confrontation outside the bar. The confrontation may have involved a photographer who was taking pictures of performers and audience members while they were in the parking lot. Dale and Carter ended up exchanging angry words.

3

Dale was standing next to Carter. A couple of minutes passed, and, when Carter looked away, Dale turned and hit him in the face, knocking him to the ground with a sneak or "sucker" punch. A friend helped Carter to his feet and asked if he was all right. Carter replied, "I am cool, bro." He started walking to his car and said, "I will be right back."

Carter got in the driver's side of his car, and started to back the car up. From the sound of the engine revving, it was likely that the car was in neutral and was simply rolling backwards down a slope in the parking lot. It appeared to witnesses that he was trying to leave the scene. He was not acting aggressively, or shouting at the Willis brothers, and he did not attempt to run into them—he "was getting out of there."

As the car was backing away, Dale was walking along the passenger side of the car. About the same time, James got out of the vehicle in which he had arrived and took a gun with him. He then flipped his hoodie up onto his head, ran up to the car, and started firing at Carter from just a few feet away. Dale and James then ran away from the scene.

Demitrius Parker, a friend of Carter, witnessed the shooting and the events leading up to it. He ran over and pulled Carter from the car and then called 911. Carter died at the scene from multiple gunshot wounds to the center of his body. Witnesses at the scene and subsequent investigators found no weapon on Carter's person or in his car and no evidence that he had fired any shots.

The State charged James with one count of premeditated first-degree murder under K.S.A. 21-5402 and one count of criminal possession of a firearm after having been convicted of a felony under the laws of another state, in violation of K.S.A. 2015 Supp. 21-6304. A jury found him guilty of both counts. He was sentenced to a hard 50 life

4

sentence for the murder conviction and a consecutive sentence of 19 months for the firearm conviction.

## DISCUSSION

James' issues on appeal largely go to his claim that he acted in self-defense. These include his assertions of prosecutorial error and his claim that the district court should have given additional lesser-included offense instructions. In considering whether there were any errors, and, if there were, whether they likely affected the outcome of the case, we will start with an overview of the situation around the time of the shooting as a guide to considering how persuasive the self-defense argument was likely to be on the jury.

The testimony of various witnesses was somewhat inconsistent; for example, one witness testified she thought it was Dale who stood at the window shooting into the car. But the evidence as a whole tended to show Carter was unarmed. Dale "sucker-punched" Carter in the face, knocking him to the ground. Carter got back to his feet, got in his car, and started to back his car out of the lot. Both Willis brothers pursued Carter's retreating car, and James fired at least six shots into Carter's torso from close range. James then ducked down and ran away from the parking lot. The video surveillance recording from a nearby store was consistent with this description of the events, and James testified that he fired numerous shots into the car.

With these factors in mind, we examine the issues James brings before us.

*Prosecutorial error*

James maintains the prosecutor improperly drew conclusions not supported by the evidence and improperly stated the law of self-defense during closing argument.

5

In determining whether a prosecutor engaged in erroneous conduct, this court considers whether the challenged acts "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

On appeal, James contends the prosecutor bolstered his argument with factual assertions that were not grounded in the record. He seeks to parse the prosecutor's statements closely with respect to the record and asks this court to conclude his defense was prejudiced by misleading assertions. He focuses on the prosecutor's contention that perceived disrespect motivated the shooting.

Specifically, the prosecutor argued to the jury:

"This was a disagreement between Dale and [Carter], a disagreement over the photographs. A disagreement that was a result of Jurl being drunk and a little bit mouthy. Dale took that as disrespect. Let's talk about disrespect because I mentioned to you in opening, this concept of disrespect. And the witnesses that came in, many of them told you about the atmosphere that night at The Roxy bar and what the concept of disrespect meant to those that were there that night.

"Demitrius Parker. Demitrious told you, you retaliate if you're disrespected. You demand respect because that reflects how you're perceived.

"Antonio Frazier who testified just the other day told you if you get disrespected, you're going to handle it right then. Remember, Dale Willis is outside with numerous members of his DOR team. He's out there with multiple other people who had seen him perform that night and who were there at the club. In front of all those people, Jurl Carter had the gall to tell him to fuck off. That was disrespect. That was disrespect in the eyes Dale Willis.

6

"So what did he do? He calls down his brother so that he can respond with street justice. He calls his brother down wearing a hoodie, armed with a gun, and takes a cheap shot at Jurl Carter."

Several witnesses spoke about disrespect. Parker told the jury:

"In our environment, respect is something that it's not given, it's kind of demanded, you take it. It's kind of like being seen as a man. You desire it, you know what I'm saying. So if somebody disrespects you, especially in a public place in front of people that know you, you're expected to do something about it. You can't just let it ride really."

And Antonio Frazier testified that Carter and his companions were in the back of their car talking and behaving disrespectfully. Frazier explained the Willis brothers "don't tolerate disrespect." He testified that Carter was doing a lot of "woofing," and Frazier concluded: "They are not going to stand for it, so it was my opinion if someone disrespects, they are going to deal with it accordingly."

In addition, Antoine Crosby, a defense witness, testified:

"I know Willo [Dale Willis]—you know what I am saying? He is not going to let nobody walk up in his face and disrespect him like that. Of course he is going to turn it into some type of fight. You fought up, and you fought up and you not talk to him. A man like that—this is exactly what it says, too. You fought up and you not talk to him, a man like that, fuck him, dot, dot."

James argues in his brief that the prosecutor drew conclusions from the testimony of the witnesses that went beyond what the witnesses actually said. Specifically, he argues that the witnesses did not state that disrespect prompted retaliatory homicide, and the witnesses did not state that Dale and James felt disrespected or were motivated by

7

disrespect. He then accuses the prosecutor of engaging in both inference-stacking and inflaming the passions of the jury based on the perpetrators' and victim's participation in the "rap scene."

Prosecutors enjoy "wide latitude" to craft arguments that include "'reasonable inferences based on the evidence.'" See, e.g., *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). But it is error when a prosecutor asserts facts or inferences that the evidence does not support. See, e.g., *State v. Waldschmidt*, 318 Kan. 633, 655, 546 P.3d 716 (2024).

No witness specifically said that Dale "took [the dispute with Carter] as disrespect," as the prosecutor asserted. But witnesses testified about an ethos in the community that demanded respect and expected an aggressive response to perceived disrespect. And there was evidence showing that *something* prompted James to jump out of his vehicle and both brothers to chase down Carter as he was backing away from the nightclub. The brothers claimed it was to protect themselves from Carter; the prosecutor offered a more plausible explanation that was moored in a culture of defending respect. That explanation was consistent with the testimony, even if it made inferences about the brothers' motivation that slightly misstated the witnesses' testimony.

James also argues that the prosecution attempted to inflame the prejudices of the jury towards people associated with rap music. This argument rests on a shaky foundation. Many of the State's witnesses were rap music performers or fans, and the victim was a rap performer. The prosecutor did not criticize or condemn rap music or rap musicians or the many people who were at The Roxy that evening to enjoy rap performances.

We conclude that the prosecution in this case made reasonable inferences that lay within the wide latitude afforded prosecutors to conduct their case and did not impinge on James' right to a fair trial.

James also argues the prosecutor misinformed the jury about the elements of self-defense. In closing argument, the prosecutor sought to undermine James' claim that he fired at Carter in self-defense. Among other contentions, the prosecutor told the jury that, in order to find that James acted in self-defense, it would have to believe that Carter had a gun with him. On appeal, James contends this inaccurately states the law of self-defense.

K.S.A. 21-5222 sets out the conditions for asserting the defense of defending a person:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

The statute essentially sets forth a two-part test for determining whether an individual justifiably used deadly force in self-defense or in defense of another. The first part of the test is subjective; it requires a showing that the defendant sincerely and honestly believed it was necessary to kill to defend themselves or others. The second part

9

of the test is objective and requires a showing that a reasonable person in the defendant's circumstances would have perceived it necessary to use deadly force in self-defense. *State v. J.L.J.*, 318 Kan. 720, 730, 547 P.3d 501 (2024). James argues that he satisfied both parts of the test even if Carter had no weapon.

The State defends its closing argument statement by asserting that James' version of the events required the jury to believe Carter had a gun. But in his testimony, James conceded he was apparently wrong about Carter having a gun, and, in closing argument, his attorney did not contend that Carter actually had a gun. He instead told the jury, "James thinks he sees a gun, and Carter backs, his lights go on at that point." He went on to say, "If he thinks that—he thinks, he doesn't even have to have a gun, he reasonably believes, and I'm going to read that for you because if you think he has to have a gun, look at the jury instructions. That was a misstatement. That does not have to be proven [w]rong." And later, he said, "James Willis believe[d] he had a gun, so don't go down the rabbit's hole of, well they can't prove he had a gun. When the prosecutor got up and said the evidence would have to show, that's a misstatement, that's not law."

Taken in isolation, the prosecutor's statement may well have misstated the law. But the challenged statement was only a part of what the prosecutor said to the jury about self-defense. Before the complained-of statement, the prosecutor correctly stated to the jury what self-defense entails:

> "[W]e have this theory of self-defense, and you have an instruction on that. And, again, this theory of self-defense is simply another example of something that does not align with the evidence in this case. This gives you the definition of self-defense, and included in there is that a person must reasonably believe force is necessary to prevent death or great bodily harm to himself or someone else from the other person's imminent use of unlawful force. This is key here, it requires a reasonable belief by the defendant and the existence of facts that would persuade a reasonable person to that belief. And the video and the evidence in this case simply blow up that self-defense theory. Jurl is sucker-

10

punched and then that imminent threat, that imminent threat is Jurl Carter is chased down and shot 11 times. A simple review of that video tells you this is not a self-defense killing."

The prosecutor referred the jury to the instruction on self-defense. That instruction read:

"As to Count 1, the defendant claims his use of force was permitted as self-defense and/or the defense of another person.

"The defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself or someone else, from the other person's imminent use of unlawful force.

"Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief. When use of force is permitted as self-defense or defense of someone else, there is no requirement to retreat."

Prosecutors may not misstate law applicable to the evidence. *J.L.J.*, 318 Kan. at 730. "A defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement." *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011). A prosecutor may, however, argue that facts do not support a defendant's theory that he or she acted in self-defense. See, e.g., *J.L.J.*, 318 Kan. at 730-31.

That is the situation that we have in this case. In the full context of the closing argument, the prosecutor simply argued that the facts did not support James' theory that he acted in self-defense. We conclude that the prosecutor did not mislead or misinform the jury about the law of self-defense.

11

*Failure to instruct on manslaughter*

The court instructed the jury on first-degree premeditated murder and the lesser-included offense of second-degree murder. Neither party requested manslaughter instructions, and the court did not give such instructions. Now, on appeal, James contends the trial court committed clear error when it failed to instruct on voluntary and involuntary manslaughter.

When, as here, a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018); see K.S.A. 22-3414(3). For the failure to be clearly erroneous, the instruction must have been legally and factually appropriate and the court must be firmly convinced the jury would have reached a different verdict if the permissible instruction had been given. The party claiming clear error has the burden to show both error and prejudice. See *Waldschmidt*, 318 Kan. at 646; *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

James argues that the facts and law supported an instruction on voluntary manslaughter based on imperfect self-defense and it was clear error not to give that instruction.

K.S.A. 21-5404(a)(2) states that voluntary manslaughter is "knowingly killing a human being committed: . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 21-5222, 21-5223 or 21-5225, and amendments thereto." We will assume without deciding that an instruction on voluntary manslaughter would have been legally appropriate because it is a lesser included offense

12

of first-degree murder and factually appropriate based on James' own trial testimony. See *State v. Gallegos*, 313 Kan. 262, 267, 485 P.3d 622 (2021).

James also argues that the facts and law supported an instruction on involuntary manslaughter. He theorizes that the evidence sufficed to show he was engaging in the lawful act of self-defense but he used excessive force in carrying it out.

K.S.A. 21-5405(a)(4) states that involuntary manslaughter includes "the killing of a human being committed:  . . . during the commission of a lawful act in an unlawful manner." Involuntary manslaughter is a lesser included offense of premeditated first-degree murder. See *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018).

This court has characterized this form of manslaughter as the "lawful exercise of self-defense, but with excessive force." See *State v. Nunez*, 313 Kan. 540, 551, 486 P.3d 606 (2021); *State v. McCullough*, 293 Kan. 970, 976, 270 P.3d 1142 (2012). Under this theory,

> "a defendant might kill when it was not reasonably necessary even though the defendant perceived a threat of death or great bodily harm. In such a case, the use of force could be found to be an 'unlawful manner' of committing the lawful act of self-defense, thus supplying the requisite element of involuntary manslaughter." *Nunez*, 313 Kan. at 551.

James contends this exactly fits his situation:  he perceived a threat of death (reasonably believing that Carter had a gun and was either firing at him or was going to fire at him), but his own use of force was not necessary, perhaps because Carter was driving away from the scene. As with voluntary manslaughter, we will assume without deciding that an instruction on involuntary manslaughter would have been both legally and factually appropriate.

But we have considered the record as a whole, including the video recording of the events of the shooting, the testimony of the many witnesses who were present at the time of the shooting, and account that James gave of what he did and why he did it, and we are not firmly convinced that the jury would have reached a different verdict if the manslaughter instructions had been given.

Finding no basis to reverse the convictions, we affirm.